SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.
OPINION
JUSTICE TODD
*1177 The Pennsylvania Constitution, since its inception in 1776, has created a framework of government vesting legislative, judicial, and executive powers in three separate branches. This tripartite structure, with its system of checks and balances among these branches, is designed to prevent a concentration of power in any one branch and to prevent one branch from exercising the core functions of another - the embodiment of the separation of powers doctrine. See Commonwealth v. Mockaitis , 575 Pa. 5, 834 A.2d 488, 499 (2003). Foundationally, the legislature creates the laws. Pa. Const. art. II, § 1. The judiciary interprets the laws. Pa. Const. art. V, § 1. Finally, Article IV, Section 2 of our charter provides the Governor "supreme executive power" to implement the laws of the Commonwealth. Pa. Const. art. IV, § 2. It is the breadth of this gubernatorial power that is at issue in this direct appeal.
Specifically, we consider whether Governor Thomas Wolf's Executive Order 2015-05 ("Executive Order" or "Order"), concerning home health care services, constitutes an impermissible exercise of gubernatorial authority. For the reasons that follow, we conclude, that given the nature of the Executive Order, Governor Wolf did not exceed his constitutional powers. Thus, we vacate the Commonwealth Court's order, and remand for additional proceedings consistent with our decision today.
The facts underlying this appeal are not in dispute. On February 27, 2015, Governor Wolf issued the Executive Order, entitled "Participant-Directed Home Care Services." The Executive Order set forth in full is attached hereto as Appendix A. The Order focused on the in-home personal (non-medical) services provided by direct care workers ("DCW") to elderly and disabled residents who receive benefits in the form of DCW services in their home rather than institutional settings ("participants"), pursuant to the Attendant Care Services Act ("Act 150"). 62 P.S. §§ 3051 - 3058. These services are rendered to some of the most challenged citizens of our Commonwealth. Often, the DCW is a participant's relative living with the participant. The Department of Human Services (the "Department") administers home care services through Act 150 and the Medicaid waiver programs - including the: Aging Waiver; Attendant Care Waiver; CommCare Waiver; Independence Waiver; and, OBRA Waiver Program (collectively, "Home Care Services Programs") - which are authorized under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1 - 1396w-5. The Department is vested with statutory responsibility to establish policies, *1178 rules, and regulations implementing Home Care Services Programs, see 62 P.S. §§ 403.1, 3057, and it oversees and administers funding for such programs.
Home care services are typically directed by the participants who receive personal care and domestic services where they reside, and they recruit, hire, and manage the DCWs who render the services in their home (an arrangement known as the "Participant Model"). However, numerous adjunct functions are performed by the Department through vendors on behalf of the participant. The Participant Model is the only type of provision of home services at issue in this appeal.[1]
In brief, the Executive Order addresses the relationship between participants, the DCWs, and the Department, establishing a new advisory group with respect to participants, and allowing DCWs to elect a representative organization for the purpose of meeting and conferring with the Department to discuss certain issues of mutual concern. It is the representative selection process and the structure of discussions between the representative and the Department which are the gravamen of the separation of powers challenge to the Executive Order.
Before moving on to that challenge, we must first discuss the Executive Order in some detail. Section 1 of the Executive Order sets forth relevant definitions. Section 2 establishes a group to advise the Governor and the Department "on ways to improve the quality of care delivered" through Home Care Services Programs ("Advisory Group"). The Advisory Group is comprised of the Secretary of the Department ("Secretary") and five members appointed by the Governor, including participants and advocates for seniors and persons with disabilities. The Advisory Group meets at least quarterly and discusses: (1) reducing the waiting list to receive services through Home Care Services Programs; (2) evaluating the Department to ensure program standards are met; (3) rebalancing Commonwealth resources from institutional care to home- and community-based services; (4) ensuring the Commonwealth adheres to the principles of participant direction, independent living and consumer choice through the Participant Model; and (5) "[o]ther issues that the Governor may deem appropriate." Executive Order, § 2 (b)(5).
Section 3 of the Executive Order creates a process for facilitating the selection of a representative of DCWs for discussions with the Commonwealth. Any organization may petition the Department to represent DCWs once it demonstrates that 50 DCWs support its representation. To aid this process, and as set forth in Section 4 below, on a monthly basis, the Department is required to compile a list of the names and addresses of all DCW workers ("DCW List") who, within the three previous months, were paid through a Home Care Services Program that provides services under the Participant Model. Upon a showing of support by 50 DCWs for an organization seeking to represent DCWs, the Secretary shall provide the organization the most recent DCW List. The Executive Order directs that the Secretary designate the American Arbitration Association ("AAA") to conduct an election for a representative of the DCWs, and provides that the AAA shall conduct an election once an organization demonstrates support from at least 10% of the DCWs on the DCW List. All DCWs are eligible to vote in the election, and a majority of votes cast determines which organization *1179 serves as the DCW representative. Only one DCW representative may be recognized at any time. Pursuant to Section 3(b), the Secretary, the Deputy Secretary, and the DCW representative meet and confer, at least monthly, regarding concerns of DCWs and ways to improve the quality of care. Specifically, they are to discuss all relevant issues, including matters relating to the quality of services; recruitment and retention of qualified DCWs; a registry for referral of workers; compensation standards; payment procedures; orientation program development; training; and voluntary payroll deductions.
In Section 3(c), entitled "Memorandum of Mutual Understanding" ("MOU"), the Executive Order further provides that the "[m]utual understandings reached during the meet and confer process shall be reduced to writing[,] [and] [w]here appropriate ... understandings reached through the meet and confer process will be implemented as the policy of the Department ...." Executive Order, § 3(c)(1). Nothing compels the Department and the DCW representative to reach a mutual understanding; however, in the event they do not, the Governor will convene a meeting of the parties to understand their respective positions, and "attempt to resolve the issues of disagreement." Id. § 3(c)(3).
Section 4 of the Executive Order concerns the creation each month of the DCW List, which includes the names and addresses of all DCWs who, within the previous three months, have been paid through a Home Care Services Program that provides participant-directed services. Additionally, any vendor or contractor that provides financial management services in connection with a Home Care Services Program is required to assist and cooperate with the Department in compiling and maintaining the DCW List.
Section 5 of the Executive Order is entitled "No Change to Existing Rights and Relationships." This Section provides that the Executive Order shall not be construed to limit communication among various Commonwealth entities; diminish any rights of employees; grant DCWs the status of Commonwealth employees; create collective bargaining rights or agreements; alter the unique relationship between individual participants and DCWs; alter participants' rights to select, hire, terminate, and supervise a DCW; or grant DCWs the right to strike or engage in other collective cessation of the delivery of services. Moreover, Section 5 states that nothing therein shall interfere with a DCW's right to join or refrain from joining a labor organization, or require a DCW to support a labor organization. Finally, Section 5 explains that nothing in the Executive Order shall limit a DCW's ability individually, or in concert with others, to petition the Commonwealth regarding any issue of concern. See id. §§ 5(c) - 5(g).
Two days after the issuance of the Executive Order, the Service Employees International Union, the American Federation of State, County, and Municipal Employees, and the United Home Care Workers of Pennsylvania ("UHCWP") sought the DCW List. Ultimately, the UHCWP won a representation election pursuant to the Order.
On April 6, 2015, Appellees Jessica Markham, Victoria Markham, Jesse Charles, Pennsylvania Homecare Association, and United Cerebral Palsy of Pennsylvania filed a petition for review in the original jurisdiction of the Commonwealth Court against Governor Wolf and the Department (collectively, "Appellants"), alleging, inter alia , that the Executive Order exceeded Governor Wolf's executive authority, usurped the authority of the General Assembly in violation of the separation of powers doctrine, and was in conflict with state statutory enactments regulating *1180 labor relations. In a separate case, Appellees Donald W. Smith and Donald Lambrecht brought similar challenges seeking declaratory and injunctive relief to invalidate the Order. (All of the parties challenging the Executive Order are collectively referred to as "Appellees.") Appellees sought, inter alia , injunctive relief and expedited review of their petition.[2]
Thereafter, at the Commonwealth Court's direction, the parties filed cross-motions for summary judgment. After hearing oral argument en banc , the Commonwealth Court, in an opinion authored by Judge Robert Simpson, found the Executive Order was valid in part, invalid in part, and enjoined Appellants from enforcing the invalid provisions. Markham v. Wolf , 147 A.3d 1259 (Pa. Cmwlth. 2016).
Specifically, the court, pointing to its decision in Shapp v. Butera , 22 Pa.Cmwlth. 229, 348 A.2d 910 (1975), explained that executive orders could be classified into three permissible types: (1) proclamations for ceremonial purposes; (2) directives to subordinate officials for the execution of executive branch duties; and (3) interpretation of statutory or other law. The court determined[3] that Section 2's establishment of the Advisory Group was to ensure the quality of home care services under the Participant Model, was solely advisory, consisted of policy-making, and, thus, was permissible as involving a directive to subordinates to gather information. The court, however, deemed Sections 3 and 4 to mandate actions - rather than merely requesting action - such as directing the Secretary to recognize a designated representative, and creating new entities, and a multi-part process, which involved non-subordinates (DCWs, the designated representatives, and the AAA), and which, in its view, altered the employment relationship between the participants and the DCWs. In particular, the court cited Section 3's "meet and confer" provisions, which it deemed to be negotiating terms and conditions of employment without input by the participants. Further, the court rejected the characterization of Sections 3 and 4 as merely information gathering; rather, it deemed them to be primarily concerned with collective bargaining. Indeed, the court noted no explanation was proffered as to why the Section 2 Advisory Group was inadequate for the information gathering at which Sections 3 and 4 were ostensibly directed.
The court then considered whether the Executive Order properly enforced or implemented existing law, or was without statutory or constitutional basis. The court determined that the Order was without basis in law and, indeed, conflicted with existing labor relations laws. Specifically, the court looked to two primary enactments of Pennsylvania labor legislation, the Pennsylvania Labor Relations Act, 43 P.S. §§ 211.1 et seq . ("PLRA"), and the Pennsylvania Employe Relations Act, *1181 43 P.S. §§ 1101.101 et seq . ("PERA"), which govern employee organization, selection of a collective bargaining representative, and the collective bargaining process. The PLRA was enacted in 1937, and governs collective bargaining in the private labor sector. By contrast, PERA, is a comprehensive labor relations statute governing collective bargaining in the public sector. The court found that the Order conflicted with these statutes.
In this regard, the court first reasoned that individuals employed in the domestic service of any person in the home of such person are specifically excluded from collective bargaining under these labor statutes. See 43 P.S. § 211.3 (excluding from the definition of "employe" of PLRA individuals employed "in the domestic service of any person in the home of such person"); 43 P.S. § 1101.301 (offering PERA applies only to public employees and public employers). Furthermore, the court observed that the designated representative was the exclusive representative for the DCWs; that the Secretary, Department, and DCW representative were mandated to "meet and confer" over the terms and conditions of employment, which resulted in an agreement, the MOU, akin to a collective bargaining agreement; and that the Commonwealth became a de facto employer. The court analogized the Executive Order framework to that of a similar executive order issued by former-Governor Edward Rendell, which was enjoined by the Commonwealth Court. Pennsylvania Homecare Association v. Rendell, No. 776 MD 2010 (Pa. Cmwlth. filed Oct. 28, 2010). Finally, the court rejected Section 5's disclaimers - that the Executive Order "shall not be construed or interpreted to create collective bargaining rights or a collective bargaining agreement under federal or state law" - noting it was the relationship created, and not the words used, that governed. Instead, the court found the Executive Order granted DCWs the right to organize and select an exclusive representative to negotiate terms and conditions of employment, resulting in a collective bargaining agreement. Thus, the court declared Sections 3, 4, and related definitions contained in Section 1, as well as parts of Section 5, to be invalid; however, finding the Order to be severable, the court upheld the validity of Section 2.
Judge Michael Wojcik dissented, finding that resolving the question of whether the DCWs were employed in domestic service to be a legal one necessitating factual development, which in his view could not be done at the summary judgment stage. Thus, he would have denied summary relief and let the matter proceed to trial.[4] Appellants filed a direct appeal to this Court.[5]
We consider in this appeal whether the Executive Order violates the separation of powers doctrine. In doing so, we consider whether, in issuing the Executive Order, Governor Wolf exceeded his gubernatorial authority; whether the Order conflicted with Act 150's participant-directed model for Home Care Services Programs; and whether the Order conflicted with state statutes regulating labor relations.[6]
*1182 As set forth in greater detail below, Appellants argue that, because it is a non-binding enactment creating no rights or duties, and is unenforceable as it is not implementing an existing statute or other law, the Executive Order is a valid exercise of gubernatorial power to communicate policy directives to subordinate officials and the public. Appellants assert it does not run afoul of Act 150 or any existing labor relations statute. Appellees counter that the Executive Order is an unconstitutional attempt by the Governor to exercise legislative power, violating the separation of powers doctrine. Appellees maintain the Order alters the relationship between DCWs, participants, and DCW representatives, and creates a new process to obtain the names and contact information of DCWs, determine a representative, and engage in collective bargaining. This, according to Appellees, is a distinctively legislative act. Additionally, Appellees submit that the Executive Order alters Act 150, which grants to participants the right to control the terms and conditions of employment of DCWs, without union intervention. Finally, like the Commonwealth Court, Appellees contend that the Executive Order is contrary to the Commonwealth's labor statutes.[7] We now turn to consideration of these contentions.
By way of background, Pennsylvania's Governor derives broad authority from our Commonwealth's Constitution. As noted above, Article IV, Section 2 of our charter bestows upon the Governor "supreme executive power," and directs him to "take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor functions as "commander-in-chief of the military forces of the Commonwealth,"[8] may appoint officers,[9] pardon criminals,[10] and approve or veto bills sent to him by the General Assembly.[11] Executive orders, however, are not mentioned in the Pennsylvania Constitution. Thus, although the Governor expressly sits atop the executive hierarchy, and may exercise numerous explicit powers, the authority to issue executive orders is only implicit. Indeed, there is a dearth of law on the origins and contours of the Governor's power to issue executive orders in Pennsylvania. An executive order is, in cursory terms, merely a document that the Governor issues and so designates. None of the parties, however, question the existence of this power; thus, we consider only the contours of that otherwise unchallenged authority.
Executive orders have been deemed both a "strong and fragile" exercise of gubernatorial power. Gubernatorial Executive Orders , 30 Rutgers L. Rev. 987, 989 (1999). Like statutes, court decisions, and regulations, executive orders may be legally binding. Id. at 989-90. An executive order may be issued or repealed with the stroke of a pen, and without the procedural or other safeguards that laws typically require. Id. at 990. An executive order need not follow a defined process like the enactment of a statute, comply with administrative procedures like a rule or regulation, *1183 or follow stare decisis as the courts must. Thus, in some ways, the authority to issue executive orders gives a great deal of power to the Governor. Id. Nevertheless, executive orders may also be seen as fragile, as they may be overturned by the issuing Governor or a future Governor. When a new Governor comes into office, he or she may rescind prior executive orders, and a sitting Governor may repeal his own executive orders when deemed necessary or when conditions have changed, such as the end of a state of emergency. Id.
Both parties point to the Commonwealth Court's decision in Shapp v. Butera , 22 Pa.Cmwlth. 229, 348 A.2d 910 (1975), as providing a foundation for understanding the types of executive orders that may be issued by the Governor. Specifically, in Shapp , the Commonwealth Court identified three types of executive orders: (1) formal or ceremonial orders, usually issued as proclamations; (2) directives to subordinate executive agency officials or employees; and (3) those that implement existing constitutional or statutory law. Id. at 913. While agreeing upon the Shapp construct, the parties do not agree in which category the Executive Order belongs. While our Court has never formally adopted the Shapp construct, and we need not do so here, we do believe it serves as a useful tool to consider the contours of executive power, and the issues before us.
While the Governor may issue executive orders, he or she must not infringe upon the powers of the other two branches of our government, including, of particular focus in this matter, the legislature. As noted above, it is for the legislature to create the law, Pa. Const. art. II, § 1, and this is an exclusive power. Indeed, the General Assembly cannot delegate its power to make the law to any other branch of government. Gilligan v. Pennsylvania Horse Racing Commission , 492 Pa. 92, 422 A.2d 487, 489 (1980). It is equally clear, as a corollary, that another branch cannot usurp the power of the legislature to create the law. While the principle of the separation of powers protects against excessive claims of power by any branch of government, at its foundation is that final lawmaking authority rests with the General Assembly. Therefore, any executive order that, in essence, creates law, is unconstitutional. Consistent therewith, and returning to the Shapp construct, only the third category of executive orders - those implementing existing constitutional or statutory law - are legally enforceable. Werner v. Zazyczny , 545 Pa. 570, 681 A.2d 1331, 1336 (1996) ("[O]nly executive orders that have been authorized by the Constitution or promulgated pursuant to statutory authority have the force of law[.]").
With this background, we consider whether the Executive Order ran afoul of the separation of powers doctrine. The parties have focused on four bases by which to analyze the validity of the Commonwealth Court's decision: (1) whether the Order was an impermissible use of the Governor's authority; (2) whether the Order is in conflict with Act 150 and participants' rights; (3) whether the Order is contrary to existing Pennsylvania labor legislation; and (4) whether the Order violates the privacy rights of DCWs and participants. We address each of these contentions seriatim . First, we analyze whether Governor Wolf exceeded his authority when he issued the Executive Order.
Appellants assert that, as the Department is free to hold discussions with any party even without the Order, the Executive Order merely creates a formal process for conducting such discussions with DCWs. Appellants contend the Commonwealth Court's focus on the mandatory nature of the process set forth in the Order was in error, as the Order is not based on, and does not implement any, constitutional *1184 or statutory law, and it does not create legally enforceable rights or duties. Therefore, the Governor did not attempt to "make law," and the Order is a valid exercise of gubernatorial power. Appellants maintain the lack of an ability to be enforced also deprives the courts of any basis to interfere with such executive orders, and, in turn, mandates that the Order be upheld. Appellants place the Executive Order into the second Shapp category above - a permissible, and unenforceable, directive to subordinates. Appellants claim the fact that the Executive Order involves non-executive branch parties does not matter as it does not grant to these individuals any legally enforceable rights, but, rather, offers a purely voluntary process. Indeed, Appellants submit that, if the creation of a process for voluntary participation by such non-executive branch parties was sufficient to declare an executive order invalid, then the Executive Order's provision creating the Advisory Group would be invalid as well; yet, they note the Commonwealth Court left that part of the Order in place.
Conversely, Appellees submit that the Executive Order falls within the third Shapp category, because the Order "makes law" without constitutional or statutory foundation; thus, they contend it is an improper exercise of gubernatorial power. According to Appellees, because it impermissibly undercuts the separation of powers between the executive and legislative branches of government, the Order is illegal. Stated another way, they contend that the question of whether DCWs should be able to organize and collectively bargain is a legislative task, and they point to numerous states in which DCWs are provided such rights by legislation. They argue that the Order is more than a simple directive to subordinates, and goes much further by altering the rights, duties, and relationships of participants and DCWs. According to Appellees, whether an executive order is legally enforceable is beside the point, as, even if unenforceable, an order may nevertheless be unconstitutional, if it is a gubernatorial attempt to exercise legislative power.
In considering whether the Governor has exceeded his authority in issuing the Executive Order, our analysis naturally focuses upon the terms of the Order itself. Thus, we consider the plain language employed in the Order to determine whether the Governor exceeded his constitutional powers.
We first note that the purpose of the Executive Order, by its terms, is to improve the quality of home care and the working conditions of DCWs. Executive Order, Whereas Clause 11. Further, the Order sets to accomplish these goals primarily through the establishment of both an Advisory Group and a process for DCWs to choose a representative, and for executive branch officials to periodically meet and confer with these representatives regarding home care policy issues. Thus, broadly speaking, the Order is an instruction from Governor Wolf to subordinate officials regarding a process for obtaining input from non-executive branch parties and/or their representatives about home care policy. More specifically, and to the point of contention in this matter, the Executive Order, as set forth above, creates a detailed and formal process by which DCWs may elect a representative for purposes of periodic "meet and confer" sessions with the Secretary and Deputy Secretary. If a representative is elected, monthly discussions focus on a variety of issues regarding the improvement of the quality of home care. Moreover, by its terms, the Order provides that any mutual understandings by the Secretary, Deputy Secretary, and DCW representative are merely to be reduced to writing.
Critically, the entire process set forth in the Order is voluntary, non-binding, non-exclusive, *1185 and unenforceable. Indeed, it is this nature of the Order that drives much of our analysis of the validity of the Governor's actions. While the Executive Order creates a formal process for conducting discussions, including the election of a DCW representative, it does not require the election of a representative. Indeed, an organization might not seek to represent DCWs, DCWs may fail to elect a representative, or DCWs may revoke representative status. Related thereto, DCWs are not required to join or support a representative organization. Moreover, the Order does not compel the DCW representative or the Secretary to take any specific action. This is true even though the Order speaks in directive terms, because the Order does not create enforceable rights or duties. Thus, in short, the Order does not mandate any action on the part of the DCWs, the DCW representative, participants, or the executive branch; it is voluntary and non-binding.
Perhaps most importantly, while Appellees claim that such an unenforceable and voluntary system, which does not implement constitutional or statutory law, must be stricken as invalid, our case law makes clear that, while such an order may not be legally enforceable, consistent with a Shapp category 2 directive to employees, it nevertheless is permissible as a gubernatorial act. See Werner v. Zazyczny , 545 Pa. 570, 681 A.2d 1331, 1336 (1996) (finding executive order creating Governor's Code of Conduct to lack authorization by the Constitution or promulgation by statute, and, thus, created no personal or property interest, but nevertheless determining that "[w]hile the Governor may issue executive orders absent such authority, these executive orders will not be enforced by the courts"); Pagano v. Pennsylvania State Horse Racing Commission , 50 Pa.Cmwlth. 499, 413 A.2d 44, 45 (1980)aff'd per curiam 499 Pa. 214, 452 A.2d 1015 (1982). Thus, simply because an executive order does not have the force of law, does not mean a Governor is beyond his authority to issue it.
Related thereto, while the Order in part directs communication by the Governor's subordinate officials with interested non-executive branch parties, simply because it also contemplates the participation of parties outside of the executive branch does not ipso facto cause the Order to be invalid. Again, because the Order provides no legally enforceable rights, if the DCWs and/or their representative choose not to participate in this process, the Governor has no remedy against them. Likewise, DCWs or their representatives have no ability to force the executive branch to take any action. However, the unenforceability of an order does not alter the Governor's authority to issue it (in this case, directing the Secretary to establish a more formal, albeit voluntary, meet and confer process). Indeed, if the mere creation of a voluntary process to meet and confer with non-executive branch parties was sufficient to render an executive order invalid, then the Advisory Group created in Section 2 would be invalid as well - a position no party asserts.
Finally, we deem it significant that, while the Order facilitates the communication process, it excludes no one: although the Order creates an Advisory Group and limits recognition to only one DCW representative, nothing precludes participants or DCWs from meeting and conferring with, i.e., petitioning, the Governor or the Department regarding home care policies. The Order merely formalizes what the Governor and executive officials could have done without an executive order.
Thus, we hold that an executive order that is voluntary, non-exclusive, and even unenforceable - as it does not implement constitutional or statutory law - is nevertheless a permissible exercise of gubernatorial *1186 power. Based on the nature of the Order as described above, we conclude that the Governor did not exceed his authority in issuing it.
As a second basis for relief, Appellants assert that the Commonwealth Court erred in holding that the Executive Order conflicts with Act 150, which grants to participants the right to control the terms and conditions of employment with their DCW, and that, pursuant to the Executive Order, the Department and the DCW representative will now determine DCWs' terms and conditions of employment without input from participants. Rather, Appellants maintain that the Executive Order does not remove any authority from the participants, as it explicitly recognizes and protects participants' authority over their services and their relationship with DCWs. Appellants contend the Order merely facilitates discussions with a workforce representative and maintains, as a safeguard, that any understanding may become policy only with the approval of the appropriate state or federal body. By contrast, Appellees submit that the Executive Order alters Act 150 by depriving participants control over their services, and disregarding the close personal relationship between participants and DCWs. According to Appellees, pursuant to the Order, the Department and the DCW representative will determine DCWs' terms and conditions of employment without input from participants.
Again, considering the plain terms of the Executive Order, we note that the Order creates an Advisory Group to meet quarterly to advise the executive branch on home care policies. The Advisory Group includes, inter alia , participant members, or their surrogates. Executive Order, § 2. Thus, participants have, through the Advisory Group, a vehicle to express their concerns and views via representation. Further, the Order, again, by its clear terms, protects participants both with respect to their existing relationship with their DCW, and prohibits actions taken by a DCW which negatively impact participants, by unambiguously declaring that "[n]othing in this Executive Order or in any [MOU] that may be reached hereunder shall alter the unique relationship between the individual participants and [DCWs]. Participants shall retain the rights to select, hire, terminate and supervise a [DCW]. This Executive Order is not intended to grant any right, or to imply that [DCWs] have any right, to engage in a strike or other collective cessation of the delivery of services." Executive Order, § 5(c). Finally, as discussed above, the Executive Order is voluntary and unenforceable. It in no way precludes participants from meeting with the Secretary, or other Department personnel, to confer and express their views on any subject. The facilitation of discussions through a DCW representative does not diminish participant authority or their ability to voice concerns.
Therefore, we find that the Executive Order does not change the relationship between participants and their DCW; does not deny participants a voice; does not undercut participants' authority or control over DCW services; is consistent with Act 150; and does not alter the home care model in any way. Rather, as noted above, the Order merely formalizes a voluntary arrangement for obtaining information and discussing policy concerns which, again, could occur in the absence of any executive order. Thus, we reject this basis on which the Commonwealth Court found the Executive Order invalid.
As the final basis for relief, the Commonwealth Court determined that the Executive Order was invalid as it conflicted with certain existing labor relations statutes. Appellants argue that the Commonwealth Court erred, contending that *1187 the Order does not grant collective bargaining rights to DCWs. Specifically, Appellants maintain that the Executive Order does not conflict with existing labor statutes, first noting that the PLRA excludes domestic service employees from its coverage, and, similarly, that PERA applies only to public employees, and DCWs are not public employees. Related thereto, Appellants assert the Executive Order, by its terms, does not grant legally enforceable collective bargaining rights, but, rather, simply provides a process for government officials to have discussions with stakeholders regarding home service care concerns. Finally, according to Appellants, any similarity to labor relations statutes is irrelevant as, unlike those laws, the Executive Order does not create any legal rights or obligations.
In response, Appellees assert, in support of the Commonwealth Court's determination, that the Order contravenes the PLRA and PERA by extending collective bargaining to employees excluded from their scope and by disregarding the procedural safeguards established by those statutes. Specifically, Appellees stress, as the Commonwealth Court noted, that the PLRA excludes from its coverage any individual employed in the domestic service of any person in the home of such person, or any individual employed by his or her parent or spouse. 43 P.S. § 211.3.[12] Likewise, PERA grants the right only to unionize to individuals employed by the Commonwealth or its political subdivisions. 43 P.S. § 1101.301(1), (2). Thus, Appellees maintain that the Order is contrary to the PLRA and PERA as it grants DCWs collective bargaining rights that they are denied under these statutes, evidencing that the Governor is impermissibly "making law" through the Executive Order. Finally, Appellees claim the Order conflicts with the PLRA and PERA by disregarding protections for workers, employers, and the public, through the statutory prohibition on unfair labor practices, 43 P.S. § 211.6 ; 43 P.S. § 1101.1201, and, thus, must be declared invalid. Contrary to Appellants' position that the Executive Order is merely a forum for idle discussion, Appellees contend that the plain language of the Order provides for the unionization of 20,000 DCWs in terms nearly identical to collective bargaining statutes. If the Order were directed at mere discussion, Appellees suggest that creation of the advisory group provided for in Section 2 would have been sufficient; instead, the Executive Order goes further and attempts to implement collective bargaining for DCWs.
Initially, we note that the Executive Order's language is clear: "The provisions of this Executive Order shall not be construed or interpreted to create collective bargaining rights or a collective bargaining agreement under any federal or state law." Executive Order, § 5(b). Thus, by its plain terms, the Executive Order does not set forth a process or establish a relationship as set forth in labor relations statutes. Admittedly, the Executive Order uses some similar concepts to those found in labor statutes: the right to representation, to meet with another entity, to discuss certain topics, and to reach some mutual understanding or agreement. However, as explained above, the Executive Order is voluntary and unenforceable, markedly unlike labor relations statutes in other critical ways, and the substance of the Order makes manifest that it does not create any rights, including collective bargaining *1188 rights, or establish a system of collective bargaining.
First, the Order, as noted above, is voluntary, non-exclusive, and does not create any enforceable rights. On this basis alone, the Order is qualitatively distinct from the PLRA and PERA. Moreover, the Executive Order does not use the term "exclusive representative" to describe the DCW representative. This is significant. While the DCW representative is chosen through an election process, and the Department will recognize only one DCW representative at a time, its role is not exclusive. Even after an election, and in stark contrast to traditional labor statutes such as the PLRA, 43 P.S. § 211.7, and PERA, 43 P.S. § 1101.606, which provide for exclusive representation by a bargaining representative, DCWs may communicate individually with the Governor or the Department for any reason, independent of the DCW representative. Moreover, the Order confers no legal authority on the DCW representative to bind individual DCWs. This is a critical distinction from traditional labor relations statutes. See generally Emporium Capwell Co. v. W. Addition Community Organization , 420 U.S. 50, 59-65, 95 S.Ct. 977, 43 L.Ed.2d 12 (1975) (setting forth limitations on union-represented employee action and expressing legal obligations created by exclusive representation); J. I. Case Co. v. NLRB , 321 U.S. 332, 337-38, 64 S.Ct. 576, 88 L.Ed. 762 (1944) (explaining exclusive representative has legal authority to enter into agreements binding individual employees). Unlike traditional collective bargaining, the DCWs are not required to join or support a representative organization. The Order does not provide for or require the collection or payment of dues. Exclusive and compulsory representation are the hallmarks of statutory collective bargaining relationships, and are entirely absent here.
Furthermore, while, under the PLRA or PERA, and the Executive Order, the Commonwealth meets to discuss certain issues with the representative, with the aim of reaching an agreement, and neither compels either party to reach an agreement, the similarity ends there. First, collective bargaining statutes establish an enforceable process by which employees, through their union and only through their union, deal directly with the employer of the employees whom the union represents. 43 P.S. § 211.5 ; 43 P.S. § 1101.701. That is not the case with the Executive Order. The participants are the employers of the DCWs, and the Order makes clear that the Commonwealth is not the employer of the DCWs. Executive Order, § 5(b) ("Nothing in this Executive Order shall be interpreted to grant [DCWs] the status of Commonwealth employees."). Moreover, under existing labor laws, there is an obligation on the part of the parties to bargain in good faith. This includes a wide range of legally enforceable responsibilities, including meeting at certain times, places, with certain frequency, and evincing an intent to bargain in an attempt to reach an agreement if possible. No such obligations to bargain in good faith exist under the Executive Order.
In addition, under existing labor laws, in the absence of an agreement between the parties, following good faith bargaining, the employees may go on strike, if legal, or either party may submit the dispute to interest arbitration, ultimately culminating in an arbitrator-created agreement. See 43 P.S. § 211.5 ; 43 P.S. §§ 1101.401, 1101.805. No such legally enforceable options exist under the Executive Order, as striking is explicitly prohibited, and, if the voluntary meet and confer discussions result in a failure to reach an understanding, there is simply no mutual understanding. There are no legally enforceable alternatives. Related thereto, the Order confers no enforcement *1189 mechanism to guarantee legal rights and obligations as in labor law statutes, because, under those laws, rights or duties may be enforced through the filing of unfair labor practice charges. 43 P.S. § 211.6 ; 43 P.S. § 1201. The PLRA, PERA, and other labor relations statutes stand in stark contrast to the Executive Order, which provides no such legal rights or protections for DCWs or their representative; rather, the Order provides only for voluntary, non-binding, and non-exclusive discourse between executive branch officials and DCWs and/or their representative.
Furthermore, unlike in the traditional labor relations context, even if an understanding is reached under the Executive Order, Appellants contend that the Order does not provide for enforceable contracts and does not compel executive-branch officials to do anything. In collective bargaining, the agreement reached by the employer and union is a contract between the parties, enforceable in the courts or through arbitration. By contrast, even if an understanding is reached under the Executive Order, it is non-binding. Further, the Order provides that any understanding that results in a policy change by the Governor still requires that agencies take all steps necessary to implement the policy decisions that came from the process, including required legislative action.
Indeed, the Commonwealth Court's consideration of the similar, yet distinct, executive order 2010-04 issued by former-Governor Ed Rendell sharpens the point. In that matter, the Commonwealth Court granted an application for preliminary injunctive relief due to "substantial legal questions" about whether the order would lead to collective bargaining agreements over employment terms and make DCWs de facto public employees. Pennsylvania Homecare Association v. Rendell , No. 776 M.D. 2010, *13 (Pa. Cmwlth. filed Oct. 28, 2010). However, that order accorded legal rights to workers in relation to their employer and the Commonwealth; made the labor organization the exclusive representative of all providers; required "negotiations;" mandated a written agreement among the parties; and required a third-party to intervene if the parties reached "impasse" during negotiations - all indicia of traditional collective bargaining. Id. at *4. None of these traditional aspects of collective bargaining is contained in the Executive Order.
In sum, the Executive Order does not conflict with labor relations statutes because it does not establish a system of collective bargaining, or indeed, create any legal rights at all. The Order contains none of the hallmarks of collective bargaining - an exclusive bargaining representative; the duty to bargain in good faith; the creation of an enforceable collective bargaining agreement; the right to engage in concerted activity; the right to file unfair labor practice charges; and the right to strike or arbitrate. The absence of these (or any) rights confirms that the Order does not constitute collective bargaining as provided for in current labor relations statutes. As such, the Order does not legislate or trespass upon existing labor laws, but merely streamlines a voluntary discussion process. Thus, we find that the Executive Order neither makes new labor law, nor runs afoul of existing labor relations statutes.
Finally, while the Commonwealth Court did not reach this issue due to its resolution of the other issues, Markham , 147 A.3d at 1270 n.14, Appellees claim the Executive Order violates the privacy rights of DCWs and participants. Specifically, Appellees assert that the Order impermissibly allows the Commonwealth to distribute the name, home address, telephone numbers, and email addresses of 20,000 DCWs to any qualified representative candidate *1190 through the DCW List, citing our recent decision in Pennsylvania State Education Association v. Commonwealth, Department of Community and Economic Development , 637 Pa. 337, 148 A.3d 142 (2016) (finding constitutional right to privacy in certain information under Right to Know Law ("RTKL") ). In that case, the Pennsylvania State Education Association ("PSEA") sought an injunction to prevent the release of the home addresses of public school employees under the RTKL. After exploring the right to privacy under the Pennsylvania Constitution, this Court concluded that our organic charter protects a person's address and other personal information from disclosure by the government unless the public interest in dissemination outweighs the privacy interest. After weighing what we deemed to be the strong privacy interests in protecting home addresses from disclosure against the negligible public benefit in disclosure, the Court found the balancing of these interests precluded disclosure of the employees' home address. While Appellants claim to have taken steps to comply with PSEA , the record does not reflect post-PSEA modifications to the processes employed by the Executive Order. Without a record or a lower court analysis of the Executive Order and the application of the balancing test contemplated by our recent decision in PSEA, we are compelled to remand this case to the Commonwealth Court to address this issue in the first instance, and to conduct further proceedings if necessary.[13]
Thus, for the reasons set forth above, we vacate the Commonwealth Court's determination that the Executive Order is infirm. However, because the Commonwealth Court did not reach Appellees' claim that the Executive Order's distribution of the DCW List impacts upon DCWs' and participants' privacy rights, we remand the matter so that the Commonwealth Court may address it.
Order vacated. Case remanded.
Justices Baer, Donohue, Dougherty and Wecht join the opinion.
Chief Justice Saylor files a dissenting opinion in which Justice Mundy joins.
Justice Mundy files a dissenting opinion.
Appendix A
Executive Order 2015-05
WHEREAS, the administration is committed to ensuring that Pennsylvania residents have access to quality home care services; and
WHEREAS, Direct Care Workers are individuals who provide vital home care services to Pennsylvania's seniors and people with disabilities who require assistance; and
WHEREAS, without assistance from Direct Care Workers who are paid through various programs administered by the Department of Human Services through its Office of Long Term Living, these residents otherwise would require Institutional care, such as that provided in a nursing home; and
WHEREAS, residents who are consumers of in-home personal care services must maintain the right to select and direct the daily work of Direct Care Workers who provide services through the programs administered by the Department of Human Services; and *1191 WHEREAS, the average cost of providing in-home personal care services is typically much less than the cost of care provided in nursing homes or similar institutional settings, and Pennsylvania's home care services programs therefore save the Commonwealth millions of dollars per year; and
WHEREAS, the demand for direct home care services is expected to rise in the coming years in light of Pennsylvania's aging population; and
WHEREAS, the quality of life for Pennsylvania's seniors and people with disabilities is significantly improved by the option of received self-directed in-home care services; and
WHEREAS, Direct Care Workers typically earn low wages and receive no benefits, paid time off, or standardized training; and
WHEREAS, as a result, the pool of Direct Care Workers available for consumers of in-home care services in Pennsylvania suffers from high turnover and inconsistent quality; and
WHEREAS, reform of the Commonwealth's home care programs requires careful consideration of its economic impact and must ensure Pennsylvania's right to receive the maximum amount of Federal funds to which it is entitled and, therefore, should be informed by input from all interested stakeholders; and
WHEREAS, the administration believes there is a need to improve both the quality of home care and the working conditions of Direct Care Workers and that these two goals are related;
NOW, THEREFORE, I, Thomas W. Wolf, Governor of the Commonwealth of Pennsylvania, by virtue of the authority vested in me by the Constitution and laws of the Commonwealth of Pennsylvania, do hereby direct the following:
1. Definitions . As used in this Executive Order, the following definitions shall apply:
a. "Department" means the Department of Human Services.
b. "Deputy Secretary" means the Deputy Secretary of Human Services for Long Term Living.
c. "Direct Care Worker" means a person who provides Participant-Directed Services in a Participant's home under a Home Care Service Program.
d. "Direct Care Worker List" means a monthly list compiled at the direction of and maintained by the Department of the names and addresses of all Direct Care Workers who have within the previous three (3) months been paid through a Home Care Service Program that provides Participant-Directed services. The list shall specify the program through which each Direct Care Worker is paid, but nothing that would identify the name of any participant.
e. "Direct Care Worker Representative" means the designated representative elected according to the procedure outlined in Paragraph 3.
f. "Home Care Service Programs" means the following programs administered by OLTL, and any successor program:
(1) The Aging Waiver Program.
(2) The Attendant Care Waiver Program.
(3) The CommCare Waiver Program.
(4) The Independence Waiver Program.
(5) The OBRA Waiver Program.
(6) The Act 150 Program.
g. "OLTL" means the Department's Office of Long Term Living.
h. "Participant" means a person who receives services from a Direct Care Workers under a Home Care Service Program.
*1192 i. "Participant-Directed Services" means personal assistance services, respite, and Participant-Directed community supports or similar types of services provided to a senior or a person with a disability who requires assistance and wishes to hire, terminate, direct and supervise the provision of such care pursuant to the Home Care Service Programs, provided now and in the future, to (i) meet such person's daily living needs, (ii) ensure such person may adequately function in such person's home, and (iii) provide such person with safe access to the community. Participant-Directed Services does not include any care provided by a worker employed by an agency as defined by Section 802.1 of the Health Care Facilities Act [.] [Act of July 19, 1979, P.L. 130, as amended,] ( 35 P.S. § 448.802a ).
j. "Secretary" means the Secretary of Human Services.
2. Advisory Group on Participant-Directed Home Care. There is hereby established an Advisory Group to ensure the quality of long-term Participant-Directed Home Care that shall be known as the Governor's Advisory Group on Participant-Directed Home Care. The Advisory Group shall advise the Governor's Office and executive branch agencies and offices of the Commonwealth (including the Department) on ways to improve the quality of care delivered through the Home Care Services Programs.
a. The Advisory Group shall be composed of seven (7) members, who shall serve at the pleasure of the Governor. The seven members shall include the Secretary, or a designee (who shall serve as chairperson of the Advisory Group), and the Deputy Secretary, or a designee. The remaining five (5) members of the Advisory Group shall be appointed by the Governor, and will include both participants or their surrogates and advocates for seniors and people with disabilities.
b. Commencing no later than June 30, 2015, the Advisory Group shall meet at least quarterly to study and discuss the experiences and best practices of other states that administer similar programs to provide Participant-Directed Home Care Services. In particular, the Advisory Group shall review the following subjects:
(1) Establishment and maintenance of policies, practices and procedures designed to ensure that the Commonwealth continues its efforts to reduce the numbers of Pennsylvania residents currently on waiting lists to receive services through the Home Care Service Programs.
(2) Evaluation of the work of OLTL so as to ensure that the program standards of the Home Care Service Programs are being met as they apply to the provision of Participant-Directed Services. However, the Advisory Group shall not be allowed to review the activities of the Department pertaining to pending reviews and investigations that involve potential fraud or criminal conduct, unless the information is publicly available.
(3) Establishment and maintenance of policies, practices and procedures designed to ensure that the Commonwealth continues its efforts to rebalance resources for long term care services from institutional care to home and community based services.
(4) Establishment and maintenance of policies, practices and procedures designed to ensure that the Commonwealth continues to adhere to the principles of participant-direction, independent living and consumer choice.
(5) Any other issues that the Governor may deem appropriate.
3. Direct Care Worker Representative. The Secretary shall recognize a representative *1193 for the Direct Care Workers for the purpose of discussing issues of mutual concern through a meet and confer process.
a. Election Process. The Secretary shall designate the American Arbitration Association to conduct an election and certify the election outcome, pursuant to the following process:
(1) An election shall be conducted to designate a representative when an organization seeking to be so designated presents signed authorization cards to the Governor, or his designee, demonstrating that at least ten (10%) percent of the providers identified on the most recent Direct Care Worker List (as described below) choose to be represented by such organization.
(2) All Direct Care Workers identified on the most recent Direct Care Worker List (at the time the election is requested) shall be eligible to vote in an election. If the majority of votes cast in the election are for the petitioning organization, the American Arbitration Association shall certify the election results, and the Secretary shall recognize the organization as the Direct Care Worker Representative. There shall only be one Direct Care Worker Representative recognized at any time.
(3) The recognized Direct Care Worker Representative shall continue to act as such for so long as such organization complies with its responsibilities concerning representation of Direct Care Workers. Direct Care Workers who wish to remove the Direct Care Worker Representative shall seek such removal in accordance with the election process set forth in this Order. Direct Care Workers may not seek such removal earlier than one (1) year after the organization is recognized as the Direct Care Worker Representative.
b. Meet and Confer Process. The Secretary, the Deputy Secretary, and the Direct Care Worker Representative shall meet and confer to address concerns of Direct Care Workers and ways to improve the quality of care provided under the Home Care Services Programs.
(1) The Secretary, the Deputy Secretary and the Direct Care Worker Representative shall meet at least monthly, on mutually agreeable dates and times.
(2) The Secretary, the Deputy Secretary and the Direct Care Worker Representative shall discuss relevant issues, including the following:
(a) The quality and availability of Participant-Directed Services in the Commonwealth, within the framework of principles of participant direction, independent living and consumer choice.
(b) The improvement of the recruitment and retention of qualified Direct Care Workers.
(c) The development of a Direct Care Worker registry or worker-participant matching service to provide routine, emergency and respite referrals of qualified Direct Care Workers to participants who are authorized to receive long-term, in-home care services under one of the Home Care Service Programs.
(d) Standards for compensating Direct Care Workers, including wage ranges, health care benefits, retirement benefits and paid time off.
(e) Commonwealth payment procedures related to the Home Care Services Programs.
(f) Development of an orientation program for Direct Care Workers working in a Home Care Services Program.
(g) Training and professional development opportunities for Direct Care Workers.
(h) Voluntary payroll deductions for Direct Care Workers.
*1194 (3) The Direct Care Worker Representative shall have the opportunity to meet with the Governor, or his designee, at least once annually to discuss the outcome of the meet and confer sessions with the Secretary.
c. Memorandum of Mutual Understanding.
(1) Mutual understandings reached during the meet and confer process shall be reduced to writing. Where appropriate, and with the approval of the Governor, understandings reached through the meet and confer process will be implemented as the policy of the Department related to Direct Care Workers providing Participant-Directed Services. If any such mutual understanding requires legislation or rulemaking, the Direct Care Worker Representative may make recommendations for legislation or rulemaking to the relevant body.
(2) Nothing in this Executive Order shall compel the parties to reach mutual understandings.
(3) In the event the parties are unable to reach mutual understandings, the Governor or a designee will convene a meeting of the parties to understand their respective positions and attempt to resolve the issues of disagreement.
4. Direct Care Worker List.
a. The Secretary shall compile a list each month of the names and addresses of all Direct Care Workers ("DCW List") who, within the previous three (3) months, have been paid through a Home Care Service Program that provides Participant-Directed Services. The DCW List shall specify every program through which each Direct Care Worker was paid. However, the DCW List shall not include the name of any participant, any designation that a Direct Care Worker is a relative of a participant, or any designation that the Direct Care Worker's home address is the same as a participant's address.
b. An employee organization that has as one of its primary purposes the representation of Direct Care Workers in their relations with the Commonwealth or other public entities may petition the Secretary to represent a particular unit of Direct Care Workers.
c. Upon a showing made to the Secretary by an employee organization described in Subparagraph 4.a. that at least 50 Direct Care Workers support the organization's petition to provide representation, the Secretary within seven (7) days shall provide to the organization the most recent DCW List, and, for an additional six (6) months thereafter, upon request shall supply subsequent monthly lists.
d. Any vendor or contractor that provides financial management services for the Commonwealth in connection with any Home Care Service Program shall assist and cooperate with the Department in compiling and maintaining the DCW List. The Secretary shall ensure that all existing and future contracts with vendors or contractors providing financial management services for the Commonwealth require the fiscal intermediary to cooperate in the creation and maintenance of the DCW List.
5. No Change to Existing Rights and Relationships.
a. Nothing in this Executive Order shall be construed to limit communication between or among Commonwealth employees, representatives of employee associations, the heads of executive branch agencies, and the Governor. The provisions of this Executive Order shall not be construed or interpreted to diminish any rights, responsibilities, powers or duties of individual employees in their service to the Commonwealth. Further, the provisions *1195 of this Executive Order shall not diminish or infringe upon any rights, responsibilities, powers or duties conferred upon any officer or agency by the Constitution or laws of the Commonwealth of Pennsylvania.
b. Nothing in this Executive Order shall be interpreted to grant Direct Care Workers the status of Commonwealth employees. The provisions of this Executive Order shall not be construed or interpreted to create collective bargaining rights or a collective bargaining agreement under any federal or state law.
c. Nothing in this Executive Order or in any Memorandum of Mutual Understanding that may be reached hereunder shall alter the unique relationship between the individual participants and Direct Care Workers. Participants shall retain the rights to select, hire, terminate and supervise a Direct Care Worker. This Executive Order is not intended to grant any right, or to imply that Direct Care Workers have any right, to engage in a strike or other collective cessation of the delivery of services.
d. Nothing in this Executive Order, or in any Memorandum of Mutual Understanding that is reached hereunder, shall alter the rights of Direct Care Workers, including the right to become a member of a labor organization or to refrain from becoming a member of labor organization.
e. In accordance with all applicable federal and Commonwealth laws, all existing or future vendors or contractors providing financial management services for the Commonwealth shall refrain from interfering with a Direct Care Worker's decision to join or refrain from joining a labor organization.
f. This Executive Order and any Memorandum of Mutual Understanding reached hereunder shall not be interpreted to require a Direct Care Worker to support a labor organization in any way.
g. Nothing in this Executive Order, or in any Memorandum of Mutual Understanding that is reached thereunder, shall limit a Direct Care Worker's ability, individually or in concert with others, to petition the Commonwealth regarding any issue of concern.
6. Cooperation by Commonwealth Agencies. Agencies under the Governor's jurisdiction shall take all steps necessary to implement the provisions of this Executive Order.
7. Effect and Duration. This Executive Order shall be effective immediately and remain in effect until amended or rescinded by the Governor.

This can be contrasted with the "Agency Model," in which a home care agency recruits, hires, and manages the DCW.

Appellants filed preliminary objections in the nature of a demurrer, asserting defenses of ripeness and standing. On April 20, 2015, Senate President Pro Tempore Joseph Scarnati and other members of the Senate Majority Caucus filed an application for relief seeking to intervene. After Appellees' petition to expedite was granted, then-President Judge Dante Pellegrini held a hearing on the request for a preliminary injunction. The next day, Judge Dan Pellegrini enjoined the preparation of a "Memorandum of Understanding," pending disposition on the merits, but permitted the other processes contained in the Executive Order to proceed. The Senate Majority Caucus' motion to intervene was denied on June 3, 2015, and, on appeal, this Court affirmed. Markham v. Wolf , 635 Pa. 288, 136 A.3d 134 (2016).

The court initially rejected Appellant's preliminary objections related to standing and ripeness, which are not at issue before our Court.

The Commonwealth Court, in an unpublished memorandum, came to the same result in Smith , relying upon its analysis in Markham . Judge Wojcik dissented for the reasons voiced in Markham .

Our jurisdiction is based upon 42 Pa.C.S. § 723(a), which grants an appeal as of right to the Supreme Court for matters commenced in the Commonwealth Court's original jurisdiction.

As each of these aspects of Appellants' challenge to the Executive Order raise pure questions of law, our standard of review is de novo , and our scope of review is plenary. Buffalo Township v. Jones , 571 Pa. 637, 813 A.2d 659, 664 n.4 (2002).

Numerous amici have filed briefs in this matter: Senator Jay Costa, on behalf of the Democratic Caucus of the Senate of Pennsylvania; the AFL-CIO, and the United Home Care Workers of Pennsylvania have filed briefs on behalf of Appellants. In support of Appellees, Senate President Pro Tempore Joseph Scarnati, III, and Speaker of the House Michael Turzai; the Center of the American Experiment; the National Right to Work Legal Defense Foundation, Inc.; and the Federation of Independent Business Small Business Legal Center have likewise submitted extensive briefing in this matter.

Pa. Const. art. IV, § 7.

Pa. Const. art. IV, § 8.

Pa. Const. art. IV, § 9.

Pa. Const. art. IV, § 15.

While Judge Wojcik dissented below, finding that resolving the question of whether the DCWs were employed in domestic service was a legal one necessitating a factual record, both parties agree that DCWs are excluded from the scope of both the PLRA and PERA; thus, we need not determine whether DCWs are domestic service employees in this appeal.

We note that the privacy concerns raised by Appellees in light of our decision in PSEA are not waived, as the argument as to why the Executive Order was impermissible was raised before the Commonwealth Court, yet, that court, grounded upon the other bases for its decision, did not believe it necessary to speak to the issue. Markham , 147 A.3d at 1278 n.14. Thus, we reject Appellants' assertion that this privacy question is waived.