IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fraternal Order of Police Lodge No. 5,   :
by its Guardian ad Litems as   :
individuals, John McNesby, John   :
McGrody, Roosevelt Poplar, Jr.,   :
Steven J. Weiler, and Nicholas   :
DeNofa,   :
                Appellants   :
   :
            v.   :  No. 417 C.D. 2023
   :  Argued: March 5, 2025
The City of Philadelphia, its Officials,   :
Agents, Employees and Assigns,   :
James Kenney, in his official capacity   :
as Mayor of Philadelphia, and Danielle   :
Outlaw, in her official capacity as   :
Police Commissioner of Philadelphia   :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge
               HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE STACY WALLACE, Judge
               HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER      FILED: September 26, 2025

The Fraternal Order of Police Lodge No. 5, by its Guardians ad Litem as individuals, John McNesby, John McGrody, Roosevelt Poplar, Jr., Steven J. Weiler,

and Nicholas DeNofa[1] (collectively, the FOP), appeal from an Order of the Court of Common Pleas of Philadelphia County (common pleas), which overruled in part and sustained in part the preliminary objections (POs) of the City of Philadelphia, James Kenney, in his official capacity as Mayor of Philadelphia (Mayor),[2] and Danielle Outlaw in her official capacity as Police Commissioner of Philadelphia (Police Commissioner),[3] (collectively, the City). Before common pleas, the FOP sought declaratory and permanent injunctive relief claiming a local ordinance and mayoral executive order related to motor vehicle stops in the City of Philadelphia was preempted by the Pennsylvania Vehicle Code (Vehicle Code), 75 Pa.C.S. §§ 101-9805, and/or First Class City Home Rule Act (Home Rule Act).[4] Common pleas found the FOP had standing to bring the action, but otherwise sustained the City's POs and dismissed the First Amended Complaint (Amended Complaint). Upon careful review, we affirm.

## I. BACKGROUND

### A. *The Car Stop Ordinance & Executive Order*

The instant matter centers on an ordinance enacted by Philadelphia City Council (Council) and an executive order subsequently issued by Mayor. Both delineate between primary and secondary violations of the Vehicle Code and provide

---

[1] McNesby is identified as the guardian ad litem of the FOP. (Amended Complaint ¶ 3, Reproduced Record (R.R.) at 24a.) McNesby, McGrody, Poplar, Weiler, and DeNofa are all identified as driving vehicles registered in the Commonwealth and regularly working and driving in Philadelphia. (Amended Complaint ¶¶ 4-8, R.R. at 25a.)

[2] Kenney served as Mayor from 2016 to 2024.

[3] Outlaw served as Police Commissioner from 2020 to 2023.

[4] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157. "As its name makes obvious, the First Class City Home Rule Act was first enacted in 1949 and applies to cities of the first class—*i.e.*, Philadelphia, the only city of the first class in Pennsylvania." *Crawford v. Commonwealth*, 326 A.3d 850, 859 (Pa. 2024).

that officers of the Philadelphia Police Department (Department) should not conduct traffic stops for those offenses defined as a secondary offense unless the officer observes a primary offense.

More specifically, Bill No. 210636-A, which Council enacted on October 14, 2021, amends Title 12 of the Philadelphia Code (Code)[5] to add Chapter 12-1700, titled "Achieving Driving Equality," to the Philadelphia Traffic Code (Traffic Code)[6] (collectively, the Car Stop Ordinance).[7] The Car Stop Ordinance was designed "to further the just, equitable, and fair enforcement of the law for all people, to provide for the fair and transparent administration of the [Traffic C]ode with respect to all, to prevent racial disparities, and to protect public safety in a manner consistent with these values." PHILA., PA., TRAFFIC CODE § 12-1701(1). Relevant here, Section 1703 of the Car Stop Ordinance, states, in full, as follows:

> **§ 12-1703. Compliance and Enforcement of the [] Vehicle Code.**
>
> (1) *Compliance with the* [] *Vehicle Code.* So long as such conduct is prohibited by the [] Vehicle Code, motorists who own or operate vehicles within the city limits shall operate, maintain, title, register, and license vehicles in accordance with the provisions of the Vehicle Code.
>
> (2) *Enforcement of Primary Violations.* A police officer or law enforcement officer may initiate a motor vehicle stop and, at their discretion, cite a driver for a violation of a primary violation observed within the City of Philadelphia without observing any other [] Vehicle Code violation.
>
> (3) *Enforcement of Secondary Violations.* To the full extent of Council's legislative authority, a police officer or other law enforcement officer may initiate a motor vehicle stop for a secondary

---

[5] PHILA., PA., CODE §§ 1-101–22-1409 (2024).

[6] PHILA., PA., TRAFFIC CODE §§ 12-101–12-3606 (2024).

[7] The Car Stop Ordinance is available at https://files.amlegal.com/pdffiles/Philadelphia/210636-A.pdf (last accessed September 25, 2025) and appears in the Reproduced Record at pages 35a through 38a.

violation observed within the City of Philadelphia only where there is a simultaneously-observed primary violation for which an officer, at their discretion, could issue a citation.

*Id.* § 12-1703 (bold and italics in original).

The Car Stop Ordinance defines a primary violation as "[a] violation of the [] Vehicle Code . . . observed within the [C]ity of Philadelphia[] that does not constitute a secondary violation." *Id.* § 12-1702(1). A secondary violation is defined as:

Violations of the following provisions of the [] Vehicle Code, and such other violations as are identified by the [] Department by regulation:

(a) [] 75 Pa.C.S. § 1301, Registration of Vehicles, when the vehicle had been previously registered within the Commonwealth within sixty days of the observed infraction.

(b) [] 75 Pa.C.S. § 1310.1(c), Temporary Registration Permits, where the violation is related to the location of the permit but the permit is otherwise clearly displayed in the rear window.

(c) [] 75 Pa.C.S. § 1332(a), Display of Registration Plate, where the violation pertains to a plate not securely fastened to the vehicle but such plate is otherwise clearly displayed.

(d) [] 75 Pa.C.S. § 4302, Periods for Required Lighted Lamps, where the violation for lighting equipment not illuminating is limited to a single brake light, head light, or running light; a single bulb in a larger light of the same; or any other single light or bulb of a vehicle light required by 75 Pa.C.S. § 4302.[8]

---

[8] Section 4302 of the Vehicle Code provides:

(a) General rule.--The operator of a vehicle upon a highway shall display the lighted head lamps and other lamps and illuminating devices required under this chapter for different classes of vehicles, subject to exceptions with respect to parked vehicles, at the following times:

(1) Between sunset and sunrise.
**(Footnote continued on next page…)**

4

(e) [] 75 Pa.C.S. § 4524(c),  Other Obstruction.[9]

(f) [] 75 Pa.C.S. § 4536,  Bumpers.[10]

---

(2) Any time when the operator cannot discern a person or vehicle upon the highway from a distance of 1,000 feet due to insufficient light or unfavorable atmospheric conditions, including rain, snow, sleet, hail, fog, smoke or smog.

(3) Any time when the vehicle's windshield wipers are in continuous or intermittent use due to precipitation or atmospheric moisture, including rain, snow, sleet or mist.

(b) Signal lights.--Stop lights, turn signals and other signaling devices shall be lighted as prescribed in this title.

(c) Applicability.--This section shall not apply to motorcycles.

75 Pa.C.S. § 4302.

[9] Section 4524(c) of the Vehicle Code provides:

No person shall drive any motor vehicle with any object or material hung from the inside rearview mirror or otherwise hung, placed or attached in such a position as to materially obstruct, obscure or impair the driver's vision through the front windshield or any manner as to constitute a safety hazard.

75 Pa.C.S. § 4524(c).

[10] Section 4536 provides:

No person shall operate any vehicle upon a highway without bumpers of a type specified by regulations of the [D]epartment [of Transportation] in both the front and rear unless the vehicle was originally designed and manufactured to be used without bumpers.  This section shall not apply to any special mobile equipment, commercial implement of husbandry or implement of husbandry that is not so equipped by the original manufacturer.  The driver of a commercial implement of husbandry equipped with vehicular hazard signal lamps shall use the signals when the vehicle is traveling below the speed limit on any highway if the vehicle is not equipped with a rear bumper.

75 Pa.C.S. § 4536.

(g) [] 75 Pa.C.S. § 4703, Operation of Vehicle Without Official Certificate of Inspection.

(h) [] 75 Pa.C.S. § 4706(c)(5), Unlawful Operation Without Evidence of Emission Inspection.

*Id.* § 12-1702(2). Section 1704 of the Car Stop Ordinance further states that Chapter 12-1700 of the Traffic Code "shall not be construed to supersede any state or federal law." *Id.* § 12-1704. Mayor signed the Car Stop Ordinance into law on October 27, 2021.

On November 3, 2021, Mayor issued Mayoral Executive Order 6-21, titled "Implementation of Driving Equality Policy" (the Executive Order).[11] Therein, Mayor recounted the City's prior "successful" efforts to prioritize certain criminal offenses over others, which "has freed [p]olice resources for enforcement activities relating to dangerous crimes." (Executive Order at 1.) Mayor, through the Executive Order, further stated the Car Stop Ordinance and another ordinance[12] are consistent with the City's overall efforts to free up the resources of police, as well as "to further the just, equitable, and fair enforcement of the law for all people," "to prevent racial disparities," and "increase transparency." (*Id.*)

---

[11] The Executive Order is available at https://www.phila.gov/media/20211109145453/executive-order-2021-06.pdf (last accessed September 25, 2025) and appears in the Reproduced Record at 40a through 44a.

[12] The other ordinance, Bill No. 210635, also amended the Traffic Code to require that certain information about traffic stops be recorded, consistent with a settlement and consent order in a class action case. *See* PHILA. PA., TRAFFIC CODE § 12-201(1)(e). A copy of that ordinance is available at https://files.amlegal.com/pdffiles/Philadelphia/210635.pdf (last accessed September 25, 2025). The Executive Order stated that ordinance "encourages the [p]olice to continue best practices that have been adopted to document trends in police vehicle and pedestrian stop activities in order to identify potential racial disparities and to improve upon such practices." (Executive Order at 1.) Section 4 of the Executive Order also provided direction as to the maintenance of an electronic database to maintain certain data related to vehicle stops.

The Executive Order states:

It is the City's policy that officers of the . . . Department . . . shall not initiate motor vehicle stops based on violations that do not create a significant risk of immediate danger, which violations are identified herein as Secondary Violations. Notwithstanding the foregoing, motorists who own or operate vehicles within the city limits shall operate, maintain, title, register, and license vehicles in accordance with the provisions of the [] Vehicle Code . . . .

(Executive Order § 1.) The Executive Order then defined primary and secondary offenses identically to the Car Stop Ordinance's definitions. (Executive Order § 2.)

Section 3 of the Executive Order stated:

(1) Enforcement of Primary Violations. A police officer may initiate a motor vehicle stop and, at the officer's discretion, cite a driver for a violation of a Primary Violation observed within the City of Philadelphia without observing any other [] Vehicle Code violation.

(2) Enforcement of Secondary Violations. A police officer may not initiate a motor vehicle stop solely for the purpose of citing one or more Secondary Violations within the City of Philadelphia. A police officer may cite a driver for a Secondary Violation in connection with a motor vehicle stop initiated based on a Primary Violation.

(3) Authority for Arrests and Dangerous Conduct. Nothing in this Executive Order shall be interpreted to limit or restrict a law enforcement officer's ability to make any arrest authorized under Pennsylvania law for an offense committed in the officer's presence; or to conduct a vehicle stop to prevent conduct that constitutes a danger to an occupant of the vehicle stopped or a danger to others including, but not limited to, a Primary Violation of the [] Vehicle Code.

(Executive Order § 3 (bold removed).) The Executive Order directed Police Commissioner to issue any necessary new directives, regulations, policy statements, and/or training practices to implement the policies set forth in the Executive Order. (Executive Order § 5.)

7

### B. *Proceedings Before Common Pleas*

On February 22, 2022, the FOP initiated this action in common pleas originally seeking a declaration that the Car Stop Ordinance was preempted by the Vehicle Code and Home Rule Act. The FOP subsequently sought leave to amend based, in part, upon a representation by the City that the Car Stop Ordinance would not be enforced, and to add a claim regarding the Executive Order. The motion to amend, which was unopposed, was granted by common pleas on September 21, 2022, and the FOP filed its Amended Complaint on September 30, 2022.

According to the FOP's Amended Complaint, the Vehicle Code "sets forth uniform regulation of registration, operation and characteristics of motor vehicles in Pennsylvania and provides for uniform enforcement of the [Vehicle Code]." (Amended Complaint ¶ 19.)[13] The Amended Complaint averred the Car Stop Ordinance, by distinguishing between primary and secondary violations, "create[d] a lesser class of [Vehicle Code] violations" and prohibited police from initiating stops "even when reasonable suspicion exists to do so." (*Id.* ¶¶ 16-17.) Consequently, the Car Stop Ordinance "nullifie[d]" certain provisions of the Vehicle Code and "attempt[ed] to amend an Act of the General Assembly." (*Id.* ¶ 18.)

As intended beneficiaries of the Vehicle Code's safety provisions and transportation funding that could be withheld as a sanction for violating the Vehicle Code's prohibition against enacting or enforcing ordinances that infringe on the Vehicle Code, the FOP asserted it had taxpayer standing to bring the action. (*Id.* ¶¶ 21-31.) The FOP alleged the Vehicle Code preempts ordinances in the same field as it. (*Id.* ¶ 32.) The Amended Complaint further alleged the Ordinance falls outside

---

[13] A copy of the Amended Complaint appears in the Reproduced Record beginning on page 22a.

8

the City's authority under the Home Rule Act. (*Id.* ¶¶ 35-36.) The FOP averred in the Amended Complaint that the Department told the Pennsylvania Law Enforcement Accreditation Commission at a hearing in July 2022, which was convened to determine whether the enactment of the Car Stop Ordinance affected the Department's accreditation, that the Car Stop Ordinance was not and would not be enforced, and, instead, "the Executive Order . . . was the sole legal basis for its actions to deem certain [Vehicle Code] offenses as 'secondary' offenses." (*Id.* ¶¶ 38-40.) Accordingly, the FOP asserted the Executive Order was also invalid as nullifying and undermining the Vehicle Code and was arbitrary, capricious and contrary to law. (*Id.* ¶¶ 41-42.)

Count I and II of the Amended Complaint sought a declaration that the Car Stop Ordinance is preempted by the Vehicle Code and prohibited by the Home Rule Act, respectively. (*Id.* ¶¶ 43-56.) Count III requested that common pleas permanently enjoin the Executive Order. (*Id.* ¶¶ 57-64.)

The City filed POs to the Amended Complaint.[14] First, the City challenged the FOP's standing to sue. Specifically, the City asserted that the alleged harm to the FOP is the same as to the general public, the allegations in the Amended Complaint depend on future events that may not occur, and that such allegations are too remote and speculative to establish a direct and immediate interest in the Car Stop Ordinance and Executive Order. In addition, the City also challenged the FOP's ability to satisfy taxpayer standing because, according to the City, the Pennsylvania Attorney General (AG) is better suited to bring this action and the FOP cannot show an adverse effect on taxpayers as a whole. (*Id.* at 51a.)

---

[14] A copy of the POs appear in the Reproduced Record beginning at page 48a.

Second, the City sought demurrers on the two declaratory judgment counts. The City asserted there was no controversy or injury related to the Car Stop Ordinance because the contested policy is controlled by the Executive Order, not the Car Stop Ordinance, and the Executive Order is a proper exercise of mayoral authority over the conduct of the Department. The City further reasserted any alleged harm was speculative and remote.

Finally, the City asserted a demurrer on Count III asserting that the FOP did not state a claim for injunctive relief because the Executive Order is a lawful exercise of law enforcement discretion, and, similar to the other POs, the harms asserted in the Amended Complaint were too remote and speculative.

On March 28, 2023, common pleas overruled in part and sustained in part the City's POs. Common pleas overruled the City's PO challenging standing and held that the FOP satisfied the five factors required to establish taxpayer standing announced by our Supreme Court in *Application of Biester*, 409 A.2d 848 (Pa. 1979). (Common Pleas' Opinion (Op.) at 6-11.)[15] Specifically, common pleas reasoned that the Car Stop Ordinance and Executive Order would otherwise likely have gone unchallenged because it is unreasonable to expect those most directly and immediately affected by the Car Stop Ordinance and Executive Order, those committing secondary violations, to challenge the non-enforcement of those violations. (*Id*. at 8-9.) Common pleas further noted that no one else came forward since the Car Stop Ordinance and Executive Order were enacted in 2021, further evidencing the likelihood they would go unchallenged. (*Id.* at 9.) Common pleas also reasoned that judicial relief was appropriate because determining the constitutionality or preemptive nature of a local ordinance are judicial duties, there

---

[15] Common pleas concluded, and the FOP conceded, that the FOP did not have standing in the traditional sense. (Common Pleas' Op. at 6-7.)

is no reasonably available alternative to challenge the Car Stop Ordinance and Executive Order, and the FOP is best suited to maintain the challenge because no alternative entity, including the AG, is positioned or willing to litigate these issues. (*Id.* at 10-11.)

Although finding the FOP had standing to pursue the claims, common pleas determined the FOP did not state claims for declaratory or injunctive relief and, accordingly, sustained the City's demurrers and dismissed the Amended Complaint. On Counts I and II of the Amended Complaint, common pleas determined the FOP had not established there was an actual controversy, reasoning that the FOP did not allege that the Car Stop Ordinance was being enforced or would be enforced. (*Id*. at 13 (citing Amended Complaint ¶¶ 37-40).)

Common pleas stated that even if the FOP had met the threshold for declaratory relief, it would have sustained the POs on alternative grounds, namely, that "[t]he supervision of the . . . Department and how and when Philadelphia police officers carry out traffic stops within the City . . . for very minor infractions of the [V]ehicle [C]ode[] are matters of purely local concern affecting the personnel and administration of the local government," not "the general welfare of the inhabitants of the State outside of Philadelphia." (*Id.* at 15 (citation and emphasis omitted); *see also id.* at 19 (holding same).) For this reason, common pleas rejected the FOP's argument that the Home Rule Act prohibited enactment of the Ordinance. (*Id.* at 15-16.)

Common pleas likewise sustained the demurrer to Count III, concluding the FOP had not established a clear right to relief, the first element of injunctive relief, because the Amended Complaint's averments about the Executive Order constituted

11

conclusions of law or opinions, not facts. (*Id*. at 20 (citing Amended Complaint ¶¶ 58-63).)

Common pleas further reasoned that, by its own terms, the Vehicle Code's prohibition against local mandates involving matters covered by the Vehicle Code only applied to local ordinances, not executive orders. (*Id*. at 21 (citing Section 6101(a) of the Vehicle Code, 75 Pa.C.S. § 6101(a)).) Nor did common pleas find that Section 18 of the Home Rule Act, 53 P.S. § 13133, controlled. Assuming Section 18 of the Home Rule Act even applied to executive orders, common pleas explained, the Executive Order at issue did not conflict with Section 18 of the Home Rule Act because the Executive "Order merely states **how and when** the secondary violations should be enforced, not **if** they should be enforced." (*Id.* at 22 (emphasis in original).) Common pleas continued:

> [T]he Executive Order does not erase from the books the infractions of the Vehicle Code listed as [s]econdary [v]iolations. The Executive Order does not nullify or attempt to amend provisions of the Vehicle Code. The Executive Order expressly permits the police to continue to cite motorists for violating **all** provisions of the Vehicle Code. The only thing that has changed is **how** and **when** the [s]econdary [v]iolations should be enforced, which is not a subject covered by any contrary section of the Vehicle Code. How and when the [s]econdary [v]iolations should be enforced are proper subjects of [] [M]ayor's supervisory powers over the [] [D]epartment and his discretion in how to enforce the law.

(*Id.* at 23-24 (emphasis in original).) Common pleas found Section 4-100 of the Philadelphia Home Rule Charter (Charter) addresses the Mayor's discretion,[16] providing: "The Mayor shall be the chief executive officer of the City. The Mayor shall be responsible for the conduct of the executive and administrative work of the

---

[16] PHILA., PA., CHARTER, § 4-100 (1952).

12

City and **for law enforcement within its boundaries**." (*Id.* at 24 (quoting Charter § 4-100) (emphasis added).) Common pleas reasoned that, generally, discretionary law enforcement decisions, like the Executive Order, are not subject to judicial review. (*Id.* at 25, 27.) Common pleas stated "[i]t is [] [M]ayor's province to assess whether a violation has occurred and whether resources are best spent on one particular enforcement method as opposed to another method." (*Id.* at 27.) Thus, common pleas sustained the demurrers and dismissed the Amended Complaint with prejudice. The FOP timely appealed.

## II. DISCUSSION

The FOP raises three issues on appeal.[17] First, the FOP argues common pleas erred in finding, in the alternative, that the Ordinance was not preempted because it was a matter of local concern. Second, it asserts common pleas erred in dismissing Counts I and II of the Amended Complaint as moot because the Car Stop Ordinance is not being enforced. Third, the FOP argues common pleas erred in sustaining the demurrer to Count III of the Amended Complaint because the Executive Order, like the Ordinance, was invalid and should have been permanently enjoined. Before

---

[17] In *Public Advocate v. Brunwasser*, we summarized our applicable appellate review:

> Our review of a trial court's order sustaining preliminary objections and dismissing a complaint is limited to determining whether the trial court abused its discretion or committed an error of law. *Petty v. Hosp. Serv. Ass'n of N[e.] Pa.*, 967 A.2d 439, 443 n.7 (Pa. Cmwlth. 2009), *appeal granted in part*, . . . 995 A.2d 873 ([Pa.] 2010). "In reviewing preliminary objections, all well pleaded relevant and material facts are to be considered as true, and preliminary objections shall only be sustained when they are free and clear from doubt." *Id.* (citation omitted). "Such review raises a question of law as to which our standard of review is *de novo* and our scope of review is plenary." *Id.* (citation omitted).

22 A.3d 261, 266 n.5 (Pa. Cmwlth. 2011).

13

turning to these issues, however, we must first examine a threshold issue, whether the FOP has taxpayer standing to pursue this action.

### A.    *Taxpayer Standing*

#### 1.    **Parties' Arguments**

The City argues that the FOP, both as an organization and as individuals, lack taxpayer standing. (City's Brief (Br.) at 9-10.) As for the FOP, the City argues that the organization did not allege it was a taxpayer. (*Id*. at 13.) Moreover, the City maintains the individual appellants did not allege any plausible harm to their interests as taxpayers. (*Id*. at 17-18.) The City posits the first harm alleged, road safety, does not relate to their status as taxpayers, and the second harm alleged, loss of transportation funding, is speculative. (*Id.* at 18-19.)

According to the City, under *In re Application of Beister*, 409 A.2d 848 (Pa. 1979), and *Stilp v. Commonwealth*, 940 A.2d 1227 (Pa. 2007), the AG and PennDOT are the appropriate entities to defend the primacy of the Vehicle Code, and, as required under *Drummond v. University of Pennsylvania*, 651 A.2d 572 (Pa. Cmwlth. 1994). (City's Br. at 15-16, 18.) To the extent common pleas found the AG and PennDOT have not taken any action, the City argues this does not, alone, confer taxpayer standing on the FOP. (*Id.* at 16-17 (citing *Fumo v. Philadelphia*, 972 A.2d 487, 506 (Pa. 2009)).)

The FOP did not respond to these arguments except to indicate that the City did not file an appeal or cross appeal challenging common pleas' ruling on taxpayer standing. (FOP's Br. at 9 n.3.)[18]

_____

[18] Although the City did not cross-appeal from common pleas' Order, as the prevailing party, under precedent, it was not required to do so. *See McGuire on behalf of Neidig v. City of*
**(Footnote continued on next page…)**

14

## 2.    Analysis

"In seeking judicial resolution of a controversy, a party must establish as a threshold matter that [they have] standing to maintain the action." *Stilp*, 940 A.2d at 1233-34 (citation omitted). "The recognition of standing based upon taxpayer status is an exception to traditional requirements of standing." *Pittsburgh Palisades*

---

*Pittsburgh*, 250 A.3d 516, 526-27 (Pa. Cmwlth. 2021) (holding an appellee did not waive its standing argument on appeal by not filing a cross-appeal when the appellee prevailed below) (citing *Lebanon Valley Farmers Bank v. Commonwealth*, 83 A.3d 107, 112 (Pa. 2013)). In *Lebanon Valley*, the Supreme Court explained:

> Pennsylvania Rule of Appellate Procedure 501 provides, "any party who is aggrieved by an appealable order . . . **may** appeal therefrom." Pa.R.A.P. 501 (emphasis added). The Note to Rule 511 further states, "An appellee should not be required to file a cross appeal because the [c]ourt below ruled against it on an issue, as long as the judgment granted appellee the relief it sought." *Id.*, 511 note (citation omitted). "Pennsylvania case law also recognizes that a party adversely affected by earlier rulings in a case is not **required** to file a protective cross-appeal if that same party ultimately wins a judgment in its favor; the winner is not an 'aggrieved party.'" *Basile v. H & R Block, Inc.*, 973 A.2d 417, 421 (Pa.2009) (citation omitted) (emphasis in original). Moreover, several Justices of this Court have gone a step further and suggested such appeals should not be permitted. *See id.*, at 424 (Saylor, J., concurring) (footnote omitted) (asserting "[protective] cross-appeals generally should not be permitted" given that "the collective burden of screening and addressing such cross-appeals may outweigh the benefits from the opportunity for an appellate court to advance the resolution of the litigation in individual cases"); *id.*, at 426–27 (Baer, J., concurring) (writing "separately to second Justice Saylor's inclinations to deem protective cross-appeals impermissible" because "refusing to hear [them] will streamline cases on appeal and prevent prevailing parties from deluging the courts with unnecessary protective cross-appeals[,]" and noting such practice would "eliminate[] the question of whether a non-aggrieved party filing a protective cross-appeal must raise every potential appealable issue for fear of waiver").

*Lebanon Valley*, 83 A.3d at 112. The Supreme Court explained the appellee there "certainly could have filed a cross-appeal," but the "Court refuse[d] to require such a filing where the court's holding granted the relief sought, although based on an alternate reasoning." *Id.*

15

*Park, LLC v. Commonwealth*, 888 A.2d 655, 661 (Pa. 2005).[19]   This exception, known as taxpayer standing, "arises from a public policy of enabling the citizenry to assert statutory challenges that might otherwise be prevented by standing issues." *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1216 (Pa. Cmwlth. 2018) (citations omitted).  To qualify for taxpayer standing, a petitioner must satisfy five elements:

> (1) the governmental action in question would otherwise go unchallenged; (2) those who are directly and immediately affected by the action complained of benefit from the action and thus are not inclined to challenge it; (3) judicial relief is appropriate; (4) redress through other channels is unavailable; and (5) no other person is better suited to bring the challenge.

*Firearm Owners Against Crime v. City of Harrisburg*, 218 A.3d 497, 514 (Pa. Cmwlth. 2019) (citations omitted).  However, "[e]ven where these five criteria are satisfied, taxpayer standing is only appropriate in cases where the challenged action

---

[19] In *Firearm Owners Against Crime v. City of Harrisburg*, we summarized the traditional standing framework as follows:

> Under a traditional standing analysis, the individual initiating the legal action must show that [they are] aggrieved by the matter that [they] seek[] to challenge. . . .  To be aggrieved, the party must have a substantial, direct, and immediate interest in the outcome of the litigation:
>
> > A substantial interest in the outcome of litigation is one that surpasses the common interest of all citizens in procuring obedience to the law.  A direct interest requires a causal connection between the asserted violation and the harm complained of.  An interest is immediate when the causal connection is not remote or speculative.

218 A.3d 497, 506 (Pa. Cmwlth. 2019) (quoting *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1215 (Pa. Cmwlth. 2018)) .

affects in some way the [party's] status as a taxpayer." *Id*. (citation and emphasis omitted).

During the proceedings below, common pleas determined that the FOP satisfied all five factors for taxpayer standing. We agree. First, it appears the Car Stop Ordinance and/or Executive Order would have been unchallenged had the FOP not brought this action, as no one, including the AG or PennDOT, has attempted to challenge the City's actions since enactment of the Car Stop Ordinance and issuance of the Executive Order in 2021. *Phantom Fireworks*, 198 A.3d at 1216.[20] Second, beyond the FOP, which represents the City's police force, the other parties affected by the Car Stop Ordinance appear to be individuals committing secondary violations of the Vehicle Code. *Id*. As common pleas aptly noted, it follows that individuals committing secondary violations of the Vehicle Code benefit from the Car Stop Ordinance and Executive Order and, thus, would not likely challenge them. Third, judicial relief is appropriate because it is the province of the judiciary to determine whether local government ordinances comport with state law. *See Cloverleaf Trailer Sales Co. v. Borough of Pleasant Hills, Allegheny Cnty*., 76 A.2d 872, 875 (Pa. 1950) ("A municipal ordinance is in reality a statute . . . ."). Fourth, it appears that redress is unavailable through other channels. *See Pa. Fed'n of Dog Clubs v. Commonwealth*, 105 A.3d 51, 58 (Pa. Cmwlth. 2014). Fifth and finally, as previously noted, because the FOP represents the City's police force, which is tasked with enforcing state law within the City, it is well situated to challenge the Car Stop

---

[20] The City argues that the AG and/or PennDOT would have standing to challenge the City's actions, and, although they have not done so, that does not confer standing on the FOP to do so. In support, the City cites *Fumo v. City of Philadelphia*, wherein the Supreme Court stated that "the fact that more appropriate governmental parties have not elected to challenge a particular governmental decision cannot be enough **on its own** to generate taxpayer standing." 972 A.2d at 506 (emphasis added). However, as explained above, the AG's and PennDOT's nonparticipation alone is not the reason we agree that the FOP has standing.

17

Ordinance. *Phantom Fireworks*, 198 A.3d at 1216. In sum, the FOP has satisfied the five elements of the taxpayer standing analysis and, therefore, qualifies for taxpayer standing. Accordingly, common pleas properly determined that the FOP had taxpayer standing to challenge the Car Stop Ordinance and Executive Order.

## B.    *The Executive Order and Permanent Injunction*

### 1.    **Parties' Arguments**

Having concluded the FOP has standing to pursue this action, we turn to the merits of the appeal, beginning with whether common pleas erred in finding that FOP did not plead sufficient facts to permanently enjoin the Executive Order.[21]

The crux of the FOP's argument on this issue is that the Vehicle Code preempts the Car Stop Ordinance, and, because the Executive Order merely implements the Car Stop Ordinance, the Executive Order necessarily is invalid too. Therefore, according to the FOP, the Amended Complaint pled a clear right to relief, as required for injunctive relief. Moreover, the FOP asserts, it pled sufficient injury as a statute of general applicability, like the Vehicle Code, cannot be abrogated by local legislation, as well as that it cannot compensate for the violation with damages and that greater injury will occur in the absence of an injunction.

To the extent the Court were to find the Executive Order is the operative document and should be considered individually without regard to the Ordinance, the FOP argues the Executive Order is contrary to the Vehicle Code and Home Rule Act. The FOP posits the Executive Order is more than a discretionary law

---

[21] On appeal, "when reviewing the grant or denial of a final or permanent injunction, [this C]ourt's review is limited to determining whether [common pleas] committed an error of law, [] and, as such, our standard of review is *de novo*, and our scope of review is plenary." *City of Philadelphia v. Armstrong*, 271 A.3d 555, 560-61 (Pa. Cmwlth. 2022) (citation and internal quotation marks omitted).

enforcement decision or matter of local concern, as common pleas found. The FOP argues "the Executive Order does far more than address enforcement of the [Vehicle Code]—it literally recategorizes certain violations so that numerous offenses will not be enforced, at least by themselves." (FOP's Br. at 40.) In the FOP's view, it is this recategorization of certain offenses that separates the Executive Order from decisions to not prosecute or enforce, which courts generally decline to review.

The City responds that the Executive Order is a valid exercise of law enforcement discretion, and such discretion is not preempted by the Vehicle Code. Specifically, the City contends the Executive Order directs "when and how" to enforce violations. (City's Br. at 20.) The City posits that while the Vehicle Code forbids a local authority to "enact or enforce any ordinance on a matter covered by the provisions of" the Vehicle Code, "it does not purport to direct **how** a local authority may choose to enforce its provisions." (*Id.* at 23 (emphasis in original).) The City points out that Section 6109 of the Vehicle Code actually recognizes "the reasonable exercise of [a local government's] police powers" and Section 6308(b) expressly provides officers "may stop a vehicle." (*Id.* at 23-24 (emphasis removed) (quoting 75 Pa.C.S. §§ 6109, 6308(b)).) The City also points out that Section 6101(a) of the Vehicle Code, by its very terms, addresses only ordinances, which the Executive Order is not. In City's view, this serves as further evidence "[t]hat the General Assembly did not intend to micromanage [] Mayor's supervision of the [] [D]epartment" and that the provision "only contemplates local regulation, not local policies setting forth how municipalities choose to enforce state regulation." (*Id.* at 24-25.)

The City also contends the Vehicle Code and Executive Order do not actually conflict as it is possible to comply with both. It reiterates that the Vehicle Code does

19

not mandate that an officer initiate a traffic stop if the officer observes a violation but leaves that decision to the officer's discretion. The City asserts "Mayor has simply exercised his supervisory authority to direct the officers' discretion via the Executive Order." (*Id.* at 25.) The City further contends that because Mayor's decision is discretionary, similar to a decision by a local law enforcement officer to not prosecute or enforce, judicial interference would be improper. Finally, the City argues the FOP cannot establish that actual and substantial injury is likely in the future, as the alleged harms are speculative.

### 2. Analysis

In *City of Philadelphia v. Armstrong*, we summarized the framework governing permanent injunctions:

> "To justify the award of a permanent injunction, the party seeking relief must establish [1] that his right to relief is clear, [2] that an injunction is necessary to avoid an injury that cannot be compensated by damages, and [3] that greater injury will result from refusing rather than granting the relief requested." *Kuznik v. Westmoreland C[nty.] B[d.] of Comm['rs]*, . . . 902 A.2d 476, 489 ([Pa.] 2006). "However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." *Buffalo Township v. Jones*, . . . 813 A.2d 659, 663-64 ([Pa.] 2003) (internal citations and quotation marks omitted).

271 A.3d 555, 560-61 (Pa. Cmwlth. 2022). "The case for a permanent injunction 'must be made by a very strong showing, one stronger than that required for a restraining-type injunction.'" *City of Philadelphia v. Shih Tai Pien*, 224 A.3d 71, 83 (Pa. Cmwlth. 2019). "[F]or the opposing party to prevail on preliminary objections in the nature of a demurrer to such a claim for injunctive relief, the court

20

must find that the [complaint] is clearly insufficient to establish a right to injunctive relief, and any doubt must be resolved in overruling the demurrer." *P.J.S. v. Pa. State Ethics Comm'n*, 669 A.2d 1105, 1113 (Pa. Cmwlth. 1996) (citation omitted).

Common pleas determined that the FOP had not established a clear right to relief, the first element for injunctive relief, because Mayor is responsible, under the Charter, for law enforcement within the City and has the discretion to decide how and when the law is enforced, which is what he did through the Executive Order. Common pleas compared this discretion to administrative agencies' or prosecutors' discretion to enforce or prosecute, which is ordinarily not subject to judicial review. Thus, we must first examine the extent of Mayor's authority, which is founded upon the Home Rule Act and the City's Charter, and how that authority is affected by the Vehicle Code, if at all.

"The Pennsylvania Constitution grants municipalities the power of self-government through the enactment of home rule charters . . . ." *Crawford v. Commonwealth*, 326 A.3d 850, 859-60 (Pa. 2024). Specifically, the Pennsylvania Constitution provides that "[m]unicipalities shall have the right and power to frame and adopt home rule charters . . . [, and a] municipality which has a home rule charter may exercise any power or perform any function not denied by th[e] Constitution, by its home rule charter or by the General Assembly at any time." PA. CONST., art. 9, § 2. In 1949, our General Assembly enacted the Home Rule Act, empowering "[a]ny city of the first class [to] frame and adopt a charter for its own government and [to] amend its charter whether the same has been originally adopted under the provisions of this act or provided by local, special or general law." Section 1 of the Home Rule Act, 53 P.S. § 13101.

21

Pursuant to this authority, the City adopted its Charter in 1951, becoming "the only city of the first class in Pennsylvania." *Crawford*, 326 A.3d at 859. The Charter expressly and exclusively vests "[t]he executive and administrative power of the City" in Mayor. PHILA., PA., CHARTER, § 1-102(1). The Charter further provides that "Mayor shall be the chief executive officer of the City [and] shall be responsible for the conduct of the executive and administrative work of the City and for law enforcement within its boundaries." *Id.* § 4-100. This is consistent with Section 1 of the First Class City Government Law, which provides that "[i]n each city of the first class of this Commonwealth, the executive power shall be vested in the mayor and in the departments authorized by this act." 53 P.S. § 12101.[22]

Mayor's responsibilities are frequently carried out by issuance of an executive order, which this Court previously determined was within Mayor's authority to issue. In *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia*, 500 A.2d 900 (Pa. Cmwlth. 1985), the City's Mayor issued an executive order creating a special investigatory commission, and common pleas determined that the Charter gave Mayor such authority. On appeal, the FOP claimed that this was error because the executive order usurped the legislative authority delegated to the city council. *Id.* at 903. We reasoned that pursuant to Sections 1-102 and 4-100 of the Charter, Mayor was the City's chief executive officer who was responsible for the conduct of the executive and administrative work of the City and for law enforcement within its boundaries. *Id.* We further explained that the Charter authorized Mayor to appoint advisory boards, which the investigatory commission was considered. *Id.* at 904.

---

[22] Act of June 25, 1919, P.L. 581, 53 P.S. § 12101. *See also Krasner v. Ward*, 323 A.3d 674, 690 n.20 (Pa. 2024) (recently citing the First Class City Government Law for its persuasive value and acknowledging that certain procedures applicable to municipal officers still exist as set forth in the statute).

We concluded Council's investigatory authority was limited to prospective legislative ordinances and other department heads' investigatory authority was not being infringed. *Id.* Thus, we concluded, Mayor had the authority to issue the executive order to exercise his executive and administrative duties.

Based on the duties and authority of Mayor through the Charter, the First Class City Government Law, and our precedent, Mayor has the authority to issue executive orders so as to exercise the executive and administrative power of the City.

Furthermore, pursuant to the Charter, Mayor is responsible for law enforcement within the City's boundaries. PHILA., PA., CHARTER, § 4-100. Mayor is described in the Charter as "undoubtedly the City's most important officer." *Id.* § 3-100(a), Annotation ¶ 2. Among Mayor's "chief assistants" is the Managing Director. *Id.* ¶ 3. Although the Charter provides that the Managing Director appoints the Police Commissioner, the Managing Director does so "[w]ith the approval of [] Mayor." *Id.* § 3-206(a). The annotation to Section 3-206 of the Charter explains that "Mayor has a voice in the appointment process because the ultimate responsibility of City administration is his." *Id.* § 3-206, Annotation. Further, although Managing Director supervises the "departments whose heads the Managing Director appoints," *id.* § 5-100, such as the Department, department heads, like Police Commissioner, "are responsible to the Managing Director who in turn is responsible to [] Mayor," *id*, Annotation ¶ 2. In short, Mayor is given full authority over the City's police force and operates as the chief law enforcement officer of the City.[23]

---

[23] This is consistent with other forms of local governance, which also vest authority over a municipality's police force with the mayor. *See, e.g.*, Section 1123.1(a)-(b) of the Borough Code, 8 Pa.C.S. § 1123.1(a)-(b) (providing "[t]he mayor shall have full charge and control of the chief of **(Footnote continued on next page…)**

Having determined Mayor has the authority to issue executive orders and is ultimately responsible for law enforcement within the City, we turn to whether Mayor had the authority to issue the Executive Order here, particularly in light of the Vehicle Code. The FOP asserts there is a conflict between Section 6101(a) of the Vehicle Code, 75 Pa.C.S. § 6101(a), and the Executive Order, and the Vehicle Code preempts local governance on traffic violations. Section 6101(a) of the Vehicle Code provides, "[t]he provisions of th[e Vehicle Code] shall be applicable and uniform throughout this Commonwealth and in all political subdivisions in this Commonwealth, and **no local authority shall enact or enforce any <u>ordinance</u> on a matter covered** by the provisions of this title unless expressly authorized." 75 Pa.C.S. § 6101(a) (emphasis added).

"In deciding matters of statutory interpretation, [courts] apply the guidelines set forth in the Statutory Construction Act [of 1972, 1 Pa.C.S. §§ 1501-1991 (Statutory Construction Act),] which provides that the object of statutory interpretation is to ascertain and effectuate the intention of the General Assembly." *Commonwealth v. Crosby*, 329 A.3d 1141, 1149 (Pa. 2025) (internal quotation marks and citations omitted). "Generally, the plain language of the statute provides the best indication of legislative intent[, and w]here a word or phrase is defined by a statute, the definition supplied by the legislature controls." *Id*. (internal quotation marks and citations omitted). "Otherwise, words are to be understood according to 'their common and approved usage.'" *Id*. "When the statutory language is ambiguous,

---

police and the police force" and "shall direct the time during which, the place where and the manner in which the chief of police and the police force perform the duties of their rank"). Even under the City's former charter and the First Class City Government Law, the "Superintendent of Police[, now Police Commissioner,] . . . [wa]s directly responsible to the Director of Public Safety, [now Managing Director,] who, in turn, is responsible to [] Mayor, the latter being primarily accountable for law enforcement in the City . . . ." *Commonwealth v. Hubbs*, 8 A.2d 618, 620 (Pa. Super. 1939).

however, [courts] may ascertain the General Assembly's intent by considering the factors set forth in Section 1921(c) of the Statutory Construction Act, 1 Pa.C.S. § 1921(c), and other rules of statutory construction." *Crawford*, 326 A.3d at 885 (citation omitted).[24]

This Court need not look far to resolve the purported conflict between Section 6101(a) of the Vehicle Code and the Executive Order. The statutory text of Section 6101(a) plainly applies to "ordinances" that are "enacted and enforced by a local authority," 75 Pa.C.S. § 6101(a), which is defined as "[c]ounty, municipal and other local boards or bodies having authority to enact laws relating to traffic," *id.* § 102. The Executive Order is neither an "ordinance" nor "enacted and enforced by a local authority." *Id.* § 6101(a). Here, under the Charter, the local authority vested with

_____

[24] Section 1921 of the Statutory Construction Act provides:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.

(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

> (1) The occasion and necessity for the statute.
> (2) The circumstances under which it was enacted.
> (3) The mischief to be remedied.
> (4) The object to be attained.
> (5) The former law, if any, including other statutes upon the same or similar subjects.
> (6) The consequences of a particular interpretation.
> (7) The contemporaneous legislative history.
> (8) Legislative and administrative interpretations of such statute.

1 Pa.C.S. § 1921.

the legislative power to pass and enact local legislation, *i.e.*, municipal ordinances, is Council. *See* PHILA., PA., CHARTER, § 1-101 ("The legislative power of the City . . . shall be exclusively vested in and exercised by a Council . . . ."); *see also* Article XVI, Section 6 of the First Class City Government Law, 53 P.S. § 12526 ("Every legislative act of the council shall be by ordinance or resolution, and every ordinance or resolution shall, before it takes effect, be presented, duly engrossed and certified, to the mayor for his approval."). Thus, guided by the principles of statutory construction and through the plain statutory text of the Vehicle Code, the restrictions found in Section 6101(a) apply only to ordinances enacted or enforced by local authorities vested with the power to enact and enforce the same, not acts of a local executive administering policy prerogatives and exercising discretion through executive orders. Accordingly, the Executive Order does not conflict with Section 6101(a) of the Vehicle Code, as the Executive Order is not an ordinance enacted by Council.

To the extent the FOP asserts the Executive Order merely implements the Car Stop Ordinance and, thus, should be preempted by the Vehicle Code, we disagree. As just explained, the Executive Order still is not an ordinance enacted by local authorities. Further, the Executive Order does not implement the Car Stop Ordinance, a legislative action by Council. It is a standalone executive action by Mayor implementing a driving equity **policy** for the Department, which is under Mayor's supervision. While the Executive Order references the Car Stop Ordinance, it does **not** incorporate the Car Stop Ordinance. The Executive Order references the Car Stop Ordinance, in addition to other ordinances and prior executive orders, to illustrate the goal of freeing up police resources to focus on more serious and dangerous crimes, promoting a fair, just, and equitable system of law, reducing racial

disparities in law enforcement, and increasing transparency. (Executive Order at 1.) The Executive Order then sets forth in full how officers under Mayor's exclusive watch should prioritize traffic violations, which are divided between primary and secondary violations.

Directing police resources is within Mayor's prerogative. In *Commonwealth v. Hubbs*, our Superior Court opined that those in charge of the Department, including Mayor, "must have some discretionary power and latitude in the performance of their duties [because t]he number of [officers] at their command is necessarily limited. **When and under what circumstances** arrests should be made or prosecutions instituted must rest in their honest judgment." 8 A.2d 618, 620-21 (Pa. Super. 1939) (emphasis added). The Executive Order issued by Mayor here does just that.

Finally, because it is within Mayor's discretion to direct his police force, similar to a prosecutor's or "agency's decision to not prosecute or enforce," the Mayor's decision in this case "is a decision generally committed to [Mayor's] absolute discretion." *Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985) (collecting cases); *see also Sinkiewicz v. Susquehanna Cnty. Bd. of Comm'rs*, 131 A.3d 541, 548 (Pa. Cmwlth. 2015) ("The exercise of an agency's prosecutorial discretion is not subject to judicial review, any more than the discretion of a criminal prosecutor not to prosecute a particular case can be reviewed by courts."). This is, in part, because an "agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, . . . whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all." *Heckler*,

27

470 U.S. at 831. Simply put, that is what Mayor has done here and this Court cannot second guess those policy decisions.[25]

In sum, considering the authority of the Mayor to issue executive orders to exercise the executive and administrative power of the City, and the Mayor's authority over the Department, it was within the Mayor's power to issue the Executive Order. Section 6101(a) of the Vehicle Code does not prohibit Mayor's Executive Order, as it is not an ordinance enacted by a local authority. Therefore, because the FOP failed to state a claim upon which relief can be granted, the FOP would not be entitled to permanent injunctive relief enjoining the Executive Order.

---

[25] The FOP also argues the Ordinance and Executive Order defeat the purpose of the Vehicle Code, which is "to make uniform the law throughout the Commonwealth and all political subdivisions." Section 103 of Vehicle Code, 75 Pa.C.S. § 103; *see also id.* § 6101(a) ("The provisions of this title shall be applicable and uniform throughout this Commonwealth and in all political subdivisions . . . ."). In the FOP's view, motorists in Philadelphia will be treated differently than motorists elsewhere in the Commonwealth. We disagree. The Vehicle Code already vests discretion in law enforcement as to whether to conduct vehicle stops. *See* Section 6308(b) of the Vehicle Code, 75 Pa.C.S. § 6308(b) (providing an officer "may" stop a motorist if it is reasonably believed to be necessary to enforce the Vehicle Code's provisions). Because every officer may enforce the Vehicle Code differently, there is already no true uniformity, at least in terms of enforcement. For instance, an officer in Delaware County may conduct a traffic stop for one violation, whereas an officer in more rural Clearfield County may not, and vice versa. Or, in municipalities served by a local police department and the Pennsylvania State Police, local officers may conduct a traffic stop for a certain violation, whereas state troopers in that same area would not. To illustrate the lack of uniformity at an extreme, an officer may initiate a traffic stop one week and the same officer may not stop a motorist committing the identical violation a week later. Thus, there is no uniformity in enforcement. Instead, the Executive Order establishing primary violations for which an officer must conduct a vehicle stop may provide uniformity. Curiously, twice during oral argument, the FOP acknowledged that there could be a policy delineating between primary and secondary violations, but argued such a policy cannot be codified in an ordinance or executive order. This stance places form over substance, and illustrates a flaw in the FOP's logic by conceding that there may be differences in enforcement.

Accordingly, we discern no error in common pleas' order sustaining the City's PO in the nature of a demurrer and dismissing Count III of the Amended Complaint.[26]

## III.  CONCLUSION

The FOP possesses taxpayer standing to challenge the Car Stop Ordinance and Executive Order.  However, regardless of whether the Car Stop Ordinance is preempted by state law, the Executive Order is not preempted and is a valid exercise of Mayor's discretion.  Therefore, common pleas properly dismissed the FOP's Amended Complaint, and we, therefore, affirm.

_____

RENÉE COHN JUBELIRER, President Judge

Judge Dumas did not participate in the decision in this case.

---

[26] Given our disposition, it is unnecessary to address whether the Car Stop Ordinance is preempted.  Even assuming it is preempted, because the Executive Order achieves the same goals as the Car Stop Ordinance through the same methods, and the Executive Order is a lawful exercise of Mayor's discretion, it is immaterial whether the Car Stop Ordinance is similarly a lawful exercise of Council's legislative power.  The Department would still be entitled to carry out the Executive Order.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fraternal Order of Police Lodge No. 5,   :
by its Guardian ad Litems as   :
individuals, John McNesby, John   :
McGrody, Roosevelt Poplar, Jr.,   :
Steven J. Weiler, and Nicholas   :
DeNofa,   :
           Appellants   :
  :
       v.   :   No. 417 C.D. 2023
  :
The City of Philadelphia, its Officials,   :
Agents, Employees and Assigns,   :
James Kenney, in his official capacity   :
as Mayor of Philadelphia, and Danielle   :
Outlaw, in her official capacity as   :
Police Commissioner of Philadelphia   :

# O R D E R

**NOW**, September 26, 2025, the Order of the Court of Common Pleas of Philadelphia County, entered in the above-captioned matter, is **AFFIRMED**.

_____
RENÉE COHN JUBELIRER, President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fraternal Order of Police Lodge No. 5,  :
by its Guardian ad Litems as  :
individuals, John McNesby, John  :
McGrody, Roosevelt Poplar, Jr., Steven :
J. Weiler, and Nicholas DeNofa,  :
             Appellants  :
                            : No. 417 C.D. 2023
         v.              : Argued: March 5, 2025
                            :
The City of Philadelphia, its Officials, :
Agents, Employees and Assigns,  :
James Kenney, in his official capacity  :
as Mayor of Philadelphia, and Danielle  :
Outlaw, in her official capacity as Police :
Commissioner of Philadelphia  :

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ANNE E. COVEY, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge
              HONORABLE CHRISTINE FIZZANO CANNON, Judge
              HONORABLE STACY WALLACE, Judge
              HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

DISSENTING OPINION
BY JUDGE WALLACE                      FILED: September 26, 2025

      Although the City's objective in addressing racial and social inequity is well intentioned, I respectfully disagree with the Majority's conclusion that Mayor's Executive Order was a valid exercise of Mayor's discretion and was not preempted

by the Vehicle Code. Moreover, I disagree with the Majority's decision to leave the issue of whether the Car Stop Ordinance is preempted unaddressed. Because I would reverse common pleas' order sustaining the City's POs in the nature of a demurrer and dismissing Counts I, II, and III of the Amended Complaint, I dissent.

First, regarding Count I of the FOP's Amended Complaint, which requests declaratory judgment asserting the Car Stop Ordinance is preempted by the Vehicle Code, I would address this issue and conclude the Car Stop Ordinance is preempted by the Vehicle Code and, accordingly, reverse common pleas' dismissal of Count I.

There are three situations in which state law preempts local ordinances: (1) where the statute contains a preemption clause expressly restricting local regulation; (2) where the state law is intended to occupy the entire field and permit no local regulation; and (3) where the local ordinance conflicts with the state law either because compliance with both is impossible or because the ordinance stands as an obstacle for the execution of the full purpose of the state law. *UGI Utils., Inc. v. City of Reading*, 179 A.3d 624 (Pa. Cmwlth. 2017). Turning to the Vehicle Code, its primary purpose "is to protect and promote public safety and property within the Commonwealth." *Sexauer v. Commonwealth*, 243 A.3d 1030, 1038 (Pa. Cmwlth. 2020) (citation omitted). To carry out this purpose, the Legislature has the authority to regulate the manner and circumstances under which automobiles may be operated upon the highways of the Commonwealth. *Dep't of Transp., Bureau of Traffic Safety v. Abraham*, 300 A.2d 831, 538 n.1 (Pa. Cmwlth. 1973) (citation omitted). This power, vested in the Legislature, is based not only upon its authority to control and regulate the use of the highways, but is also supported by the inherent police power of the state. *Id*. In furtherance of its purpose to promote public safety, the Legislature has drafted our Vehicle Code to operate as a system of general regulation

prescribing the manner and by whom motor vehicles may be operated upon the highways of the state. *Maurer v. Boardman*, 7 A.2d 466, 472-73 (Pa. 1939).

An express goal of the Vehicle Code is, understandably, for the law throughout the Commonwealth to be uniform. Section 103 of the Vehicle Code provides: "This title shall be so interpreted and construed as to effectuate its general purpose to make uniform the law throughout this Commonwealth and all political subdivisions." 75 Pa.C.S. § 103. Furthermore, Section 6101 of the Vehicle Code (Section 6101) provides:

> 6101. Applicability and Uniformity of Title
>
> **(a) Requirement.--**The provisions of this title shall be applicable and uniform throughout this Commonwealth and in all political subdivisions in this Commonwealth, and no local authority shall enact or enforce any ordinance on a matter covered by the provisions of this title unless expressly authorized.
>
> **(b) Sanctions.--**When a court of competent jurisdiction determines and notifies the department that an ordinance adopted by a local authority is in violation of subsection (a), commencing 40 days following entry of a final order, unless an appeal has been timely filed with a court of record, the following sanctions apply until the local authority repeals or substantially amends the ordinance to remove the language that was found to be in violation of subsection (a):
>
>> (1) Suspension of unobligated capital expenditures for bridges and highways.
>>
>> (2) Suspension of allocation under the act of June 1, 1956 (1955 P.L. 1944, No. 655), referred to as the Liquid Fuels Tax Municipal Allocation Law.
>>
>> (3) Suspension of allocation and apportionment under section 9010(c.1) (relating to disposition and use of tax).

(4) Suspension of expenditures from the special fund into which allocations under the Liquid Fuels Tax Municipal Allocation Law are deposited, unless a contract for the work that is the subject of the expenditure has been fully executed or the moneys have been otherwise obligated.

**(c) Suspended funds.**--Upon notification that the local authority has repealed or substantially amended the ordinance to remove the language that was found to be in violation of subsection (a), the department shall immediately end all sanctions against the local authority and return all suspended funds to the local authority.

75 Pa.C.S. § 6101 (emphasis added).  Not only does the Vehicle Code expressly indicate its intent that the law be consistent throughout the Commonwealth, but it also expressly states a local authority shall not "*enact or enforce*" an ordinance on a matter covered by the provisions of the Vehicle Code.  *Id*. (emphasis added). Beyond merely prohibiting such action, the Legislature went out of its way to impose sanctions against a local authority that violates this provision.

Section 6109 of the Vehicle Code (Section 6109) carves out an exception for local authorities within their physical boundaries to "reasonably exercise" their police powers.  75 Pa.C.S. § 6109.  It states, in relevant part:

**(a) Enumeration of police powers.**--The provisions of this title shall not be deemed to prevent . . . local authorities on streets or highways within their physical boundaries from the reasonable exercise of their police powers.  The following are presumed to be reasonable exercises of police power:

(1) Except as limited by subsections (g) and (h), regulating or prohibiting stopping, standing or parking.

(2) Regulating traffic by means of police officers or official traffic-control devices.

(3) Subject to subsections (j) and (j.1), regulating or prohibiting processions, special activities or assemblages on highways.

(4) Designating particular highways or roadways for use by traffic moving in one direction as authorized in section 3308 (relating to one-way roadways and rotary traffic islands).

(5) Establishing speed limits for vehicles in public parks.

. . . .

(20) Adopting and enforcing such temporary or experimental regulations as may be necessary to cover emergencies or special conditions.

. . . .

(23) Adopting such other traffic regulations as are specifically authorized by this title.

**(b) Action by local authorities.--**Action taken by local authorities under this section shall be:

(1) by ordinance of the local governing body; or

(2) by a commission of public official authorized to act on specified matters.

. . . .

**(g) Delegation of powers in cities of the first class.--**

(1) Notwithstanding any contrary provision . . . , the parking authority of a city of the first class shall enforce and administer the system of on-street parking regulation in a city of the first class on behalf of the city. The system of on-street parking regulation shall include all ordinances and resolutions enacted or adopted by the city of the first class pursuant to the powers specified under subsection (a)(1) and those certain stopping, standing and parking provisions provided in sections 3351

(relating to stopping, standing and parking outside business and residence districts), 3353 (relating to prohibitions in specified places) and 3354 (relating to additional parking regulations).

75 Pa.C.S. § 6109.

It is evident the Car Stop Ordinance addresses matters "covered by the provisions of" the Vehicle Code. The Car Stop Ordinance categorizes the Vehicle Code's violations into two categories: Primary Violations and Secondary Violations. Reproduced Record (R.R.) at 116a. As the Majority explains, the "Secondary Violations" include: Registrations of Vehicles, 75 Pa.C.S. § 1301; Temporary Registration Permits, 75 Pa.C.S. § 1310.1(c); Display of Registration Plate, 75 Pa.C.S. § 1332(a); Periods for Required Lighted Lamps, 75 Pa.C.S. § 4302; Other Obstruction, 75 Pa.C.S. § 4524(c); Operation of Vehicle Without Official Certificate of Inspection, 75 Pa.C.S. § 4703; and, Unlawful Operation Without Evidence of Emission Inspection, 75 Pa.C.S. § 4706(c)(5). *Id*. at 117a. The Car Stop Ordinance then provides: "A police officer or law enforcement officer may initiate a motor vehicle stop and, at their discretion, cite a driver for a violation of **a primary violation** observed within the City of Philadelphia without observing any other Pennsylvania Vehicle Code violation." *Id*. at 117a (emphasis added). The next section indicates: "[A] police officer or other law enforcement officer may initiate a motor vehicle stop for **a secondary violation** observed within the City of Philadelphia **only where there is a simultaneously-observed primary violation** for which an officer, at their discretion, could issue a citation." *Id*. (emphasis added). In contrast, Section 6308(b) of the Vehicle Code provides:

Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has **reasonable suspicion that a violation of [the Vehicle Code]** is occurring or has occurred, **he may stop a vehicle**, upon request or signal, for the purpose of checking the

vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa. C.S. § 6308.

Thus, the Car Stop Ordinance divides the Vehicle Code's violations into two distinct categories and precludes police officers from exercising discretion when initiating traffic stops for violations of what it deems "secondary" offenses. I agree with the FOP's assertion that, in practice, by thwarting the enforcement of those provisions, the Car Stop Ordinance essentially nullifies those provisions within the City, thereby undermining the uniformity the Vehicle Code intended. Moreover, the Car Stop Ordinance does not fall within any of the "reasonable" exceptions contemplated by Section 6109, and I believe it goes well beyond the scope of what is envisioned as "reasonable" under this provision. Despite the City's position that the Car Stop Ordinance is not being enforced, it nevertheless remains enacted as part of the Philadelphia Code. Council's enactment of the Car Stop Ordinance was, itself, a violation of Section 6101's clear prohibition against enacting an ordinance on a matter covered by the Vehicle Code without express authorization. Furthermore, because Section 6101 expressly restricts local regulation, and the Car Stop Ordinance conflicts with the Vehicle Code, the Car Stop Ordinance is preempted by the Vehicle Code. I disagree with common pleas' conclusion that the "lack of present or future enforcement of the [Car Stop Ordinance] results in the absence of a real controversy and deprives [common pleas] of declaratory judgment jurisdiction over the [Car Stop Ordinance]." In my view, the mere enactment of the Car Stop Ordinance created a "real controversy" and, therefore, I would reverse common

pleas' order insofar as it sustained the City's PO to Count I of the Amended Complaint.

Second, regarding Count II of the Amended Complaint, which requests declaratory judgment asserting the Car Stop Ordinance is invalid because it is contrary to the First Class City Home Rule Act of 1949 (the Home Rule Act),[1] I would address this issue, and, in doing so, I would reverse common pleas' dismissal of Count II of the Amended Complaint.[2] Under the Home Rule Act, first class cities that adopt a home rule charter are granted "all powers and authority of local self-government" and "complete powers of legislation and administration in relation to its municipal functions." 53 P.S. § 13131. A first class city's ability to exercise municipal functions is limited only by its home rule charter, the Pennsylvania Constitution, and the General Assembly. *See In re Petition to Recall Reese,* 665 A.2d 1162, 1164 (Pa. 1995). In relevant part, the Home Rule Act provides that its general grant of powers is "[s]ubject to the limitations" provided therein, 53 P.S. § 13131, which include those set forth in Section 13133 of the Home Rule Act. Section 13133 provides, in relevant part:

> Notwithstanding the grant of powers contained in this act, no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are-
> . . . .

---

[1] Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157.

[2] Had this Court been tasked with making the ultimate determination that the Car Stop Ordinance is preempted by the Vehicle Code, there would be no need to address whether the Car Stop Ordinance is also preempted by the Home Rule Act. However, my disposition would not resolve the ultimate issue, as this Court is addressing whether common pleas erred by granting the City's POs and dismissing all three counts of the FOP's Amended Complaint. The ultimate determination on the FOP's request for declaratory judgment not being before us, I would proceed to examine the second issue, and ultimately remand for common pleas to address all three counts.

(b) Applicable in every part of the Commonwealth.

(c) Applicable to all the cities of the Commonwealth . . . .

53 P.S. § 13133(b)-(c).

Here, as addressed above, the Vehicle Code is applicable in every part of the Commonwealth. Further, the Legislature has clearly indicated its intent for the Vehicle Code to apply uniformly by limiting local governments from enacting ordinances regarding vehicle regulations, except when expressly authorized to do so. Because the City has exercised powers contrary to powers granted by the Vehicle Code, the Car Stop Ordinance violates the Home Rule Act. Just as the enactment of the Car Stop Ordinance ripened the actual controversy in Count I, I would similarly conclude the enactment of the Car Stop Ordinance is sufficient, regardless of enforcement, to ripen the actual controversy in Count II.

Finally, regarding Count III of the FOP's Amended Complaint, which requests a permanent injunction enjoining the Executive Order, I disagree with the Majority's conclusion that the Executive Order is not preempted and is a valid exercise of Mayor's discretion. The Majority, as did common pleas, relies on the language of Section 6101 which states "no local authority shall enact or enforce any **ordinance** on a matter covered by" the Vehicle Code. 75 Pa.C.S. § 6101(a) (emphasis added). The Majority concludes the prohibition in Section 6101(a) applies to *ordinances* enacted or enforced by local authorities and, because the Executive Order is not an *ordinance*, it does not conflict with Section 6101(a). I disagree with this reasoning.

The Majority emphasizes that Section 6101 includes language which explicitly prohibits a "local authority" from enacting or enforcing an "ordinance," but does not include language that prevents an executive, such as Mayor, from

SW - 9

executing an order. However, we must consider that Section 6101 also provides the "provisions of [the Vehicle Code] shall be **applicable and uniform** throughout this Commonwealth and in all political subdivisions in this Commonwealth." 75 Pa.C.S. § 6101 (emphasis added). The Legislature's specification of the term "ordinance" in its language makes sense when we look at the definitions and purpose of an ordinance versus an executive order. An ordinance is an "authoritative law or decree; spec., a municipal regulation, esp. one that forbids or restricts an activity." Black's Law Dictionary 1325 (11th ed. 2019). Meanwhile, an executive order is "[a]n order . . . intended to direct or instruct the actions of executive agencies or government officials, or to set policies for the executive branch to follow." Black's Law Dictionary 715 (11th ed. 2019). Thus, as a general rule, we expect ordinances to be laws or regulations, while we expect executive orders merely to provide direction to executive agencies or to set policies for the executive branch. Recognizing these distinctions, we may understand the Legislature's specific prohibition against "ordinances" on matters covered by the Vehicle Code. Yet, the objective of Section 6101, the uniformity of provisions of the Vehicle Code, remains the same. While Section 6101 specifically prohibits "ordinances" which frustrate the Vehicle Code's goal of uniformity, it certainly does not purport to permit executive orders that would undermine this goal.

Furthermore, it is unnecessary for the Legislature to expressly forbid members of the executive branch from issuing executive orders that create law contrary to the Vehicle Code because the United States and Pennsylvania Constitutions already prohibit such action. Foundationally, our constitutions create a framework of government vesting legislative, judicial, and executive powers in three separate branches. *Markham v. Wolf*, 190 A.3d 1175, 1177 (Pa. 2018). This structure creates

SW - 10

a system of checks and balances among the branches which is designed to prevent concentration of power in any singular branch and to prevent one branch from exercising the functions of another. *Id*. This is the embodiment of the separation of powers doctrine, which is "the cornerstone of our democratic form of government." *Heller v. Frankston*, 464 A.2d 581, 585 (Pa. Cmwlth. 1983). Under our constitutions, the legislature creates the laws, Pa. Const. art. II, § 1; U.S. Const., Art. I, § 1, the judiciary interprets the laws, Pa. Const. art. V, § 1; U.S. Const., Art. III, § 1, and the executive branch implements the laws, Pa. Const. art. IV, § 2; U.S. Const., Art. II, § 1. Here, like the governor, Mayor represents the executive branch of government and is tasked with executing the laws, not creating or interpreting them. *See Shapp v. Butera*, 348 A.2d 910, 914 (Pa. Cmwlth. 1975). Indeed, "any executive order that, in essence, creates law, is unconstitutional" because it violates the separation of powers doctrine by infringing on the Legislature's exclusive power to create the law. *Markham*, 190 A.3d at 1183. The importance of keeping these powers separated cannot be understated, especially when we consider that an "executive order need not follow a defined process like the enactment of a statute, comply with administrative procedures like a rule or regulation, or follow *stare decisis* as the courts must." *Id*. at 1182-83. Accordingly, the Legislature did not need to specify that the issuance of executive orders contrary to the Vehicle Code's provisions is prohibited because our constitutions already prevent such action by the executive branch.

While I agree with the Majority that Mayor has the authority and discretion to direct the City's police resources, he lacks the authority to issue executive orders that conflict with state law. An executive order may not "be contrary to any constitutional or statutory provision, nor may it reverse, countermand, interfere with,

or be contrary to any final decision or order of any court." *Shapp*, 348 A.2d at 914. As explained above, Mayor's power, as a member of the executive branch of government, is to execute the laws, not to create or interpret them. *See id.* Here, the Executive Order seeks to modify the existing Vehicle Code by delineating its infractions into categories and prohibiting the police from conducting traffic stops based upon certain offenses, without any lawful authority to do so. The Executive Order conflicts with the Vehicle Code by essentially nullifying what the Mayor deems the "secondary violations" of the Vehicle Code. Additionally, the Executive Order eliminates the discretion given to police officers in Section 6308(b) to initiate traffic stops for violations of the Vehicle Code's provisions by prohibiting police officers from initiating traffic stops for the "secondary" offenses. I cannot agree with the City's argument, which the Majority adopts, that the Executive Order is analogous to "prosecutorial discretion." Majority Op. at 27. Prosecutorial discretion is applied on a case-by-case basis by police officers and prosecutors, while the Executive Order seeks to remove the discretion contemplated by the Vehicle Code from police officers within the City's limits.

Further, I must disagree with the Majority's reasoning regarding the uniformity of the Vehicle Code. The Majority blurs the distinction between the "uniformity" of the provisions of the Vehicle Code with the "uniformity" in enforcement of its provisions. By the plain language of Section 6101, the Legislature has indicated its clear intent that the *provisions* of the Vehicle Code be "applicable and uniform" throughout the Commonwealth. 75 Pa.C.S. § 6101. Additionally, the Vehicle Code expressly envisions variability in *enforcement* because it grants police officers discretion to initiate traffic stops for violations of the Vehicle Code. *See* 75 Pa.C.S. § 6308(b). That police officers throughout the

SW - 12

Commonwealth have discretion does not diminish uniformity of the Vehicle Code's provisions. The "uniformity" Section 6101 references, contemplates that the offenses for which a driver may be stopped are consistent throughout the Commonwealth and that enforcement of its provisions is consistent in that, as outlined in the Vehicle Code, police officers **may** stop vehicles for violations of the Vehicle Code. The Executive Order undermines the uniformity intended by the statute by, in effect, prohibiting police officers in the City from exercising the discretion the Vehicle Code afforded them to enforce the violations the City deemed "secondary" violations. This renders those violations unenforceable, while those same violations are enforceable elsewhere in the Commonwealth.[3]

---

[3] Notably, I also disagree with the Majority's position that "the Executive Order establishing primary violations for which an officer must conduct a vehicle stop may provide uniformity." Majority Op. at 28. First, the Executive Order does not require that a police officer "must" conduct a vehicle stop for "Primary Violations." Instead, it indicates a police officer "**may** initiate a motor vehicle stop and, at the officer's discretion, cite a driver for a violation of a Primary Violation." R.R. at 123a (emphasis added). Furthermore, I would not adopt the Majority's reasoning that

> Curiously, twice during oral argument, the FOP acknowledged that there could be a policy delineating between primary and secondary violations, but argued such a policy cannot be codified in an ordinance or executive order. This stance places form over substance, and illustrates a flaw in the FOP's logic by conceding that there may be differences in enforcement.

Majority. Op. at 28 n.25. Certainly, the legal ramifications of a police department's initiation of a "policy" may be significantly different than the enactment of an ordinance or an executive order, where an ordinance or executive order may have the force of law and must comply with constitutional limitations. *See Friends of Danny Devito v. Wolf*, 227 A.3d 872, 892 (Pa. Cmwlth. 2020). Moreover, I disagree that it is a flaw in logic to acknowledge the enforcement of the Vehicle Code varies in practice, consistent with its plain language granting discretion. *See* 75 Pa.C.S. § 6308(b). The issue is that the Executive Order eliminates the discretion authorized by the Vehicle Code and makes some of its provisions unenforceable within the City, thereby diminishing the uniformity intended by the statute.

As the Majority notes, "the Executive Order achieves the same goals as the Car Stop Ordinance through the same methods."[4] Maj. Op. at 29 n.26. In my opinion, the method is unlawful and the Executive Order, like the Car Stop Ordinance, is preempted by the Vehicle Code. Furthermore, by issuing the Executive Order that modifies the provisions of the Vehicle Code and is contrary to its terms, Mayor has exceeded his constitutional authority. I agree with the FOP that it would lead to an absurd result to conclude the City could evade judicial review by initiating an executive order that abrogates a state law when the City could not enact an ordinance that does the same. Therefore, I would reverse common pleas' dismissal of Count III of the Amended Complaint.

Accordingly, in my view, common pleas erred by concluding the FOP failed to state claims for declaratory and injunctive relief, sustaining the City's demurrers, and dismissing the Amended Complaint. Therefore, I would reverse common pleas'

---

[4] I agree that insofar as the Executive Order mimics the language of the Car Stop Ordinance, it "achieves the same goals as the Car Stop Ordinance through the same methods." Maj. Op. at 29 n.26. However, I take issue with the Majority relying on this to avoid the question of whether the Car Stop Ordinance is preempted. The Majority reasons the Executive Order is "a standalone executive action by Mayor implementing a driving equity policy for the Department," and it is within "Mayor's discretion to direct *his* police force." Majority Op. at 27 (emphasis added). However, even if I agreed the Executive Order provides policy direction to only the City's police officers, the Car Stop Ordinance, which remains enacted as part of the Philadelphia Code, purports to order that "a police officer or law enforcement officer" may initiate a traffic stop for what it deems a "secondary" violation "only where there is a simultaneously-observed primary violation" within the City. R.R. at 117a. Thus, I cannot agree with the Majority that it is "immaterial whether the Car Stop Ordinance is . . . a lawful exercise of Council's legislative power [because] [t]he Department would still be entitled to carry out the Executive Order." Majority Op. at 29 n.26. The reach of the Car Stop Ordinance extends beyond the Department's police officers. Certainly, it is foreseeable that other police officers, such as Pennsylvania State Police troopers, may observe such violations in the City, as well. If, as the Majority reasons, the Executive Order is merely a policy directive to the Department's police officers, then it seems necessary to address the Car Stop Ordinance because it purports to direct all police officers within the City, some of whom, including Pennsylvania State Police troopers, are tasked with enforcing state law and are not under the Mayor's direction.

order sustaining the City's POs, and remand to common pleas for further proceedings.


_____
STACY WALLACE, Judge


Judge McCullough joins in this Dissenting Opinion.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Fraternal Order of Police Lodge No. 5, : 
by its Guardian ad Litems as individuals,: 
John McNesby, John McGrody, : 
Roosevelt Poplar, Jr., Steven J. Weiler, : 
and Nicholas DeNofa, : 
Appellants : 
: 
v. : No. 417 C.D. 2023
: 
The City of Philadelphia, its Officials, : 
Agents, Employees and Assigns, James : 
Kenney, in his official capacity as : 
Mayor of Philadelphia, and Danielle : 
Outlaw, in her official capacity as : 
Police Commissioner of Philadelphia : Argued: March 5, 2025

BEFORE: HONORABLE RENÉE COHN JUBELIRER, President Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE STACY WALLACE, Judge
HONORABLE MATTHEW S. WOLF, Judge

## OPINION NOT REPORTED

DISSENTING OPINION BY
JUDGE WOLF                                     FILED: September 26, 2025

The effort by Philadelphia government aimed at eradicating racial discrimination in law enforcement is more than a worthy undertaking. Pursuing racial equity in the application of law enforcement is a truly laudable end.

Our High Court has balanced Pennsylvanians' "right to be free from unreasonable searches and seizures" with our "interest in having the Vehicle Code enforced" and held that reasonable suspicion is required to stop a vehicle. *Commonwealth v. Chase*, 960 A.2d 108, 119 (Pa. 2008). As other jurists and scholars note, this level of criminal suspicion may not be the protection we imagine. "The pervasiveness of automobile regulation makes unregulated government authority to conduct traffic stops the equivalent of a general warrant," and suspicion for small vehicle offenses "do[es] not meaningfully limit an officer's discretion." *State v. Brown*, 930 N.W.2d 840, 914-15 (Iowa 2019) (Appel, J., dissenting) (quoting Wesley MacNeil Oliver, *With an Evil Eye and an Unequal Hand: Pretextual Stops and Doctrinal Remedies to Racial Profiling*, 74 TUL. L. REV. 1409, 1414 (2000)).

Reasonable suspicion is just a fig leaf if one can be stopped for driving three miles per hour too fast, a bent license plate, or a lane deviation measured in inches—or even for driving with scrupulous perfection, which is too good to be true and thus also suspicious. *See id.* at 914-15 (collecting cases). We have all done these things. When everyone is a suspect, no one is protected from arbitrary or discriminatory enforcement.

Arbitrary enforcement is dangerous partly because it enables discriminatory enforcement. Other jurists are embroiled now in a debate over whether a person's "apparent ethnicity" "*can be* a relevant factor" among others when policing for *immigration* violations.[1]    Even there everyone agrees—I hope—that race or

---

[1] *Noem v. Vasquez Perdomo*, ___ U.S. ___, No. 25A169, slip op. at 5-6 (Sept. 8, 2025) (mem.) (Kavanaugh, J., concurring in grant of stay). *But see id.* at 19-20 (Sotomayor, J., dissenting from grant of stay) (noting that "it is the [g]overnment's burden to prove that it has reasonable suspicion to stop someone," and that considering race or ethnicity "shifts the burden onto an entire class of citizens to carry enough documentation to prove that they deserve to walk freely.")

ethnicity *alone* cannot support reasonable suspicion of anything, ever. This case is about traffic stops, not immigration, and we can all agree that race is entirely irrelevant to reasonable suspicion of a *Vehicle Code* violation. Therefore, Philadelphia is correct as a matter of law to root out racial discrimination in traffic enforcement, because racial discrimination by government is unconstitutional.

However, the means must be legal. Both the Car Stop Ordinance and the Executive Order, which must be read in context together, must operate within the limits of the law. Here they do not, because state law prohibits them. Because in the compelling need to eradicate racial profiling by police the ends cannot justify the means, I dissent.

The Vehicle Code requires cars throughout the Commonwealth of Pennsylvania to have basic things on cars in working order such as taillights, brake lights, headlights, bumpers and it also requires the display of current inspection stickers and license plates. The Vehicle Code requires that these provisions are to be uniform throughout the Commonwealth and all its political subdivisions, which, as such, expressly includes Philadelphia. The Vehicle Code unambiguously states: "[N]o local authority shall enact or enforce any ordinance on a matter covered by the provisions of this title unless expressly authorized." 75 Pa.C.S. § 6101(a). Everyone in Pennsylvania should know that they can be pulled over by the police for having a vehicle in disrepair or if they have not kept up with inspection or license plate requirements. But everyone in Philadelphia should know that they cannot be pulled over by the police for the same requirements that apply throughout Pennsylvania.

That is due to an ordinance and executive order passed by the Philadelphia government in 2021. On October 27, 2021, the Philadelphia City Council passed,

and Mayor Jim Kenney signed into law, the Car Stop Ordinance which prohibited local law enforcement from enforcing the Vehicle Code (i.e., pulling people over) on those things such as taillight violations, headlight violations, brake light violations, inspection sticker requirements and license plate requirements, unless there was some other more serious violation involved. One week after passage and adoption of the Car Stop Ordinance, on November 3, 2021, Mayor Kenney issued Executive Order 6-21, which contained language mirroring the Car Stop Ordinance's, at places reproducing it word-for-word. Lest any confusion linger about the Executive Order's background, its "Whereas" language explains on its first page that "the policies set forth" in the Car Stop Ordinance "are consistent with the overall efforts of the City . . . to free police resources for enforcement activities relating to dangerous crimes[.]" Reproduced Record (R.R.) at 40a.

As noted above, the Vehicle Code clearly specifically prohibits adoption or enforcement of an ordinance dealing with the Vehicle Code. That is, obviously, exactly what we have here in this case: an ordinance on a matter covered by the Vehicle Code and an executive order enforcing the ordinance. Yet, the Vehicle Code specifically prohibits this. On top of the specific prohibition, there is also the doctrine of preemption which clearly applies to this situation. For these reasons, both the Car Stop Ordinance and the Executive Order are unlawful.

**The Philadelphia Car Stop Ordinance Violates the Vehicle Code**

It is beyond peradventure that the Car Stop Ordinance is at variance with the Vehicle Code. Appellants sought relief separately against the Car Stop Ordinance. "Based on the averments set forth in this Complaint, Plaintiffs are entitled to a declaration that the Car Stop Ordinance is preempted by the [Vehicle Code] and therefore, is invalid." Complaint ¶ 37. Common pleas did not grant this relief

MSW-4

despite, incorrectly, only finding that Executive Order was a legitimate exercise of executive authority. Nor does the Majority Opinion in this matter address head on the illegitimacy of the Car Stop Ordinance.

Section 6101(a) of the Vehicle Code provides that "[t]he provisions of th[e Vehicle Code] shall be applicable and uniform throughout this Commonwealth and in all political subdivisions in this Commonwealth, and **no local authority shall enact or enforce any ordinance** on a matter covered by the provisions of this title unless expressly authorized." 75 Pa.C.S. § 6101(a) (emphasis added). Unquestionably, the Car Stop Ordinance deals with matters covered by the Vehicle Code. Section 12-1702(2) of the Car Stop Ordinance cites eight Vehicle Code provisions and places the offenses they create into a new category that does not exist in the Vehicle Code itself, and for which the Vehicle Code gives no authorization. *See* PHILA., PA., TRAFFIC CODE § 12-1702(2)(a)-(h). Section 12-1703 imposes conditions on enforcement of those Vehicle Code provisions that, similarly, the Vehicle Code does not authorize. *See id.* § 12-1703. The Majority devotes not a scintilla of analysis to explain how these provisions can survive the Vehicle Code's strict prohibition on local ordinances.

I dissent because Appellants legitimately complained about the Car Stop Ordinance independently and directly and the Car Stop Ordinance is clearly prohibited by the Vehicle Code, as a matter of law.

**The Car Stop Ordinance is Preempted by the Vehicle Code**

Both common pleas and the Majority deprived Appellants of a judicial determination to which they were entitled. That is, whether the Car Stop Ordinance is preempted. This relief was specifically and narrowly pled by Appellants, separate from a determination on the executive order. While common pleas essentially

ignored this claim for relief the Majority was dismissive of this claim for relief, claiming it not necessary to address this issue.[2] If, as the Majority claims, the executive order is a "standalone executive action," *Fraternal Ord. of Police Lodge No. 5 v. City of Phila.* (Pa. Cmwlth., No. 417 C.D. 2023, filed September 26, 2025), slip op. at 26 (Majority Opinion), then it would take nothing away from its analysis of the executive order to, in turn, find the ordinance preempted, which it clearly is. Indeed, neither common pleas nor the Majority undertake a preemption analysis because they separate out the executive order and determine that it is lawful.

It is unfair of the Court to ignore a claim by a litigant aimed at a clearly preempted ordinance. The common pleas should have, and this Court should still, analyze and determine whether the Car Stop Ordinance is preempted. Because this claim was ignored, I dissent.

### Mayor Kenney's Executive Order Enforces the Car Stop Ordinance

I do not share the Majority's willingness to turn a blind eye to the fact that Mayor Kenney's Executive Order is enforcing the Car Stop Ordinance. It cannot be ignored that the Car Stop Ordinance was an enactment of the City's legislative authority, which carried the force of law at the time that the Executive Order was issued; nor can it be overlooked that, on the Executive Order's effective date of November 3, 2021, the Mayor was bound by the provisions of the Car Stop Ordinance, which had taken effect one week before. It would also be remiss of us not to notice that the Car Stop Ordinance could *only* have found its practical

---

[2] Specifically, the Majority states: "Given our disposition, it is unnecessary to address whether the Car Stop Ordinance is preempted. Even assuming it is preempted, because the Executive Order achieves the same goals as the Car Stop Ordinance through the same methods, and the Executive Order is a lawful exercise of Mayor's discretion, it is immaterial whether the Car Stop Ordinance is similarly a lawful exercise of Council's legislative power. The Department would still be entitled to carry out the Executive Order." Maj. Op. at 29 n.26.

implementation through the Executive Order, given that the Mayor wields ultimate responsibility over the City's law enforcement. It is, for these reasons, erroneous to interpret the Police Commissioner's remark that the Car Stop Ordinance was not being enforced as a basis for pretending that the legislation was not *in force*. To the contrary, the record before us firmly supports the Amended Complaint's factual averment that the Executive Order is merely the instrument by which the Car Stop Ordinance is put into action. How can it also be ignored that the Executive Order mirrors the language of the Car Stop Ordinance and specifically references it?

In spite of the clear and direct correspondence between the Executive Order and the Car Stop Ordinance that it puts into action, the Majority treats the nexus as a sort of legal nullity, where the ordinance is a vestigial document that can be omitted without loss from our analysis. The Executive Order, we are told, is a "standalone executive action" implementing a driving equity policy for employees (i.e., the police) under the Mayor's supervision. Majority Opinion at 26. While acknowledging that the Executive Order "references" the Car Stop Ordinance, the Majority insists that it does not *incorporate* that legislation.[3] *Id.* The characterization of the Executive Order as "standalone" can only make sense if we are to believe that the Mayor and Council, pursuing parallel agendas, independently devised the same solution to the problems they both recognized; then, in an even more extraordinary coincidence, both the Mayor and Council identified precisely the same eight Vehicle Code provisions that are subject to enforcement limits, which are given identical definitions in both the Car Stop Ordinance and the Executive Order. Such an improbable theory of how the Executive Order came into existence becomes an even greater strain on one's credulity when we recall that the Executive

---

[3] Whether it is incorporating or referencing the ordinance, Mayor Kenney's executive order is clearly enforcing the ordinance.

Order's "Whereas" language expressly cites the Car Stop Ordinance as a basis for its implementation. Thus, by its own language, the Executive Order acknowledges that it does not *stand alone*; it is derived from the Car Stop Ordinance and gives it the power of enforcement that would otherwise be lacking.

It should be underscored that the Vehicle Code prohibits not only the *enactment* of local ordinances in conflict with it but their *enforcement* as well. Where the Majority observes that Section 6101(a) refers to local ordinances and not actions by local executives, the focus on enactment is misplaced. Because it cannot be credibly denied that the Executive Order is the mechanism by which the Car Stop Ordinance is enforced,[4] it, too, is prohibited under Section 6101(a).[5]

To endorse the City's flimsy legal basis for the Executive Order is to create a danger that extends far beyond the City's limits; after all, it essentially hands municipalities throughout the Commonwealth the blueprint for an end run around Section 6101's preemption of local traffic laws. Under the Majority's reasoning, a municipal legislative body can enact an ordinance in clear violation of Section 6101

---

[4] Because "enforce[ment]" itself is part of the plain text of Section 6101(a)'s prohibition, I would not focus only on enactment of ordinances as the Majority appears to do. But I also would not treat the purposes of the Vehicle Code as a first-line consideration in deciding if the executive order is permitted, as Judge Wallace appears to do. *See Fraternal Ord. of Police Lodge No. 5 v. City of Phila.* (Pa. Cmwlth., No. 417 C.D. 2023, filed September 26, 2025) (Wallace, J., dissenting) (Dissenting Opinion), slip op. at 10. The language of the statute speaks clearly to this, and is enough to conclude that because the Executive Order enforces the Car Stop Ordinance, it is prohibited.

[5] The Majority observes that Section 6101(a) applies only to enactment or enforcement by a "local authority." Maj. Op. at 26 (citing 75 Pa.C.S. § 6101(a)). Since Section 102 defines "local authorities" as "[c]ounty, municipal and other local boards or bodies having authority to enact laws relating to traffic," 75 Pa.C.S. § 102, the Majority reasons that only the City Council is subject to this prohibition. But this depends on an overly reductive reading of the statute. Under the City Charter, it is the Mayor, not the City Council, who is ultimately responsible for law enforcement in the City. Thus, to interpret Section 6101(a) as intended only to prohibit actions by the City Council is to ignore its clear reference to *enforcement*.

by laundering it through an ostensibly independent executive action, so long as the municipal body trots out an official to state publicly that only the executive action, not the legislation, is being enforced. Such a state of affairs would flout the Vehicle Code's express purpose of "mak[ing] uniform the law throughout the Commonwealth and all political subdivisions," 75 Pa.C.S. § 103, and potentially leave the Commonwealth with a patchwork of traffic laws varying from one municipality to the next.

**The Executive Order Reduces Enforcement Discretion**

The Majority makes much of Mayor Kenney's "discretion" and likens it to prosecutorial discretion. Majority Opinion at 27. But that conflates the executive discretion vested in Mayor Kenney with the discretion that matters under the Vehicle Code. It is for police and prosecutors—not the Mayor, who is not a prosecutor—to determine how to investigate and charge violations of the Vehicle Code. The Majority cites Section 6308(b) of the Vehicle Code, which states this clearly: "Whenever *a police officer*[6] . . . has reasonable suspicion that a violation of this title is occurring or has occurred, he *may*[7] stop a vehicle . . . as *the officer* may reasonably believe to be necessary to enforce the provisions of [the Vehicle Code]." 75 Pa.C.S. § 6308(b) (emphasis added).

Although the Majority upholds the executive order as an exercise of enforcement "discretion," in reality the order reduces discretion by changing a "may" in the statute to a "shall not" in the executive order. Officers on the ground doing policework should have the discretion that the statute lawfully gives them.

---

[6] Not only is the Mayor not a prosecutor, but the Mayor is not a police officer. A police officer is "[a] natural person authorized by law to make arrests for violations of law." 75 Pa.C.S. §102.

[7] The natural language of this provision appears to vest discretion to stop on the police officer. The Car Stop Ordinance and enforcing Executive Order purport to divest the police officer of this statutory authority.

The executive order takes away that discretion, which is another reason to find it prohibited by the Vehicle Code.

Because Appellants stated facts in this case sufficient for a valid claim that the Mayor and Council have failed to heed the Vehicle Code's limits,[8] I would reverse common pleas' order to the extent it sustained the City's preliminary objections and remand for further proceedings.

_____
MATTHEW S. WOLF, Judge

_____

[8] Unlike Judge Wallace, *see* Dissenting Opinion at 8-9, I would remand to the trial court without reaching the issue of whether the Car Stop Ordinance or the Executive Order violate the First Class City Home Rule Act of 1949 (Home Rule Act), Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101-13157. Considering violation of the Home Rule Act—which is the basis for Count II of the Amended Complaint—is unnecessary to resolve the current appeal. If, as I believe to be true, Appellants may well be entitled to declaratory relief on Count I of the Amended Complaint because the Car Stop Ordinance is prohibited by the Vehicle Code, then on that basis alone they may be entitled to the material relief they seek in Count III of the Amended Complaint—an injunction of the Executive Order, which simply enforces the unlawful Car Stop Ordinance. The trial court could conceivably so rule on remand without considering the Home Rule Act. Whether the Council's and Mayor's actions also violate the Home Rule Act is thus not relevant here, and I would not address that issue because the principal issue—the Vehicle Code—is dispositive.